BOLIVAR TOWNSHIP, BOARD OF FINANCE OF BENTON COUNTY *v.* HAWKINS ET AL.

[No. 26,327. Filed June 28, 1934. Rehearing denied October 8, 1934.]

*Berry & Nolin,* for appellant.

*Fraser & Isham, Randolph & Randolph, Stuart, Stuart & Devol, Dix & Dix, Walker & Walker,* and *Earnest M. Hawkins,* for appellees.

HUGHES, C. J.—This is an action brought by the appellant to recover the sum of $28,977.24, together with interest and attorney fees from the appellees as sureties on a depository bond given to secure the public money on deposit in the State Bank of Otterbein, Otterbein, Indiana, belonging to Bolivar civil township and Bolivar school township, Benton county, Indiana, at the time of the failure and closing of said bank, which bond was given in compliance with the provisions of the Public Depository Act of the State of Indiana, being Chapter 222 of the Act of 1907, as amended. And the particular questions involved being whether appellees, uncompensated individual sureties upon the depository bond of the State Bank of Otterbein, given to secure

the deposit of funds belonging to Bolivar civil township are relieved from liability by the terms and provisions of Chapter 78, Acts 1933, page 488, the depository bond having been given subsequent to January 1, 1927, to wit, January 6, 1931.

The complaint averred, among other things, that on the 6th day of January, 1931, the board of finance of Bolivar township met in regular session for the purpose of selecting a depository for the funds of said township and said school township; that the State Bank of Otterbein filed its proposal to receive deposits of the public funds of Bolivar township and Bolivar school township in a sum not to exceed $60,000 at any time; that said bank at said time tendered and delivered to the board of finance, security for such deposits, a personal bond in the sum of $35,000, the said bank being principal and said defendants sureties thereon; that said board of finance accepted the proposal of said bank and funds were deposited in said bank; that on June 6, 1931, the bank was closed and placed in the control of the State Banking Department, and a receiver was appointed therefor, that on June 6, 1931, the said township had on deposit in said bank the sum of $30,477.24; that said bank was indebted to said township for the payment of said sum; that a demand had been made upon the receiver and each of defendants for payment, but payment has been refused; that the sum of $5,500 has been paid on said principal.

The appellees filed an answer to the complaint of appellants admitting many of the allegations of the complaint. Among other things alleged in the answer, it is asserted all of the funds on deposit, except $5,203.54, was raised by general taxation; that said amount of $5,203.54 was raised otherwise than by general taxation in said Bolivar township and Bolivar school township; that payments of $5,500 had been

made on said bond and that said amount exceeded the amount of said deposit representing funds not raised by general taxation; that said bond is a "Personal Bond," and said defendants became obligated thereon, without compensation and pursuant to Chapter 222 of the Acts of 1907 as amended. That by reason of an act of the General Assembly of 1933, the same being Chapter 78, Acts of 1933, page 488, the said defendants and each of them are relieved, released, and discharged from any liability on said bond.

The appellant, plaintiff below, filed a demurrer to the answer of appellees, defendants below. The demurrer was overruled and the plaintiff refused to plead further and judgment was rendered for defendants.

The appellant's assignment of error is as follows: (1) The trial court erred in overruling appellant's demurrer to the appellees' answer and supplemental answer; (2) the trial court erred in rendering judgment against the appellant, that it take nothing by its complaint.

The title of the Act of 1933, which is in question is as follows: "AN ACT entitled 'An act concerning liability of sureties on public depository bonds given to secure deposits of public funds, granting relief in certain cases from liability on such bonds, upon judgments obtained thereon, and upon any evidence of indebtedness given in lieu of such liability, to certain sureties and their heirs, legatees, devisees and personal representatives, providing for the application of payments made or which may be made on such bonds, deposits or judgments, providing for the application and disposition of certain payments and the issuance and acceptance of warrants therefor, saving rights of contribution and subrogation in certain cases and declaring an emergency.' "

Section 1 of said Act is as follows:

"Public Depository Bonds—Freehold Sureties—Release and Discharge

Section 1. *Be it enacted by the General Assembly of the State of Indiana,* That any and all persons and the heirs, legatees, devisees and personal representatives of any and all persons who were accepted as freehold sureties and became obligated, *without compensation,* on any personal bond or bonds given pursuant to chapter 222 of the Acts of 1907, as amended, to secure deposits in a bank, banking institution or trust company, designated, on or after January 1, 1927, as a public depository of public funds belonging to any county, city, town, school corporation or any other municipal or political subdivision, other than the state, are hereby relieved, released and discharged from any and all liability on or on account of such bond or bonds to the extent that deposits secured by such bond or bonds represent funds *raised by general taxation* in the municipal corporation or political subdivision making such deposits." (Our italics.)

In this opinion, we shall consider the questions involved in the order presented by appellant in its brief. Its first proposition is: The act is unconstitutional because it violates §19 of Article 4 of the Constitution of the State of Indiana. Said section is as follows: "Every act shall embrace but one subject and matter properly connected therewith, which subject shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title." §122, Burns, 1926.

Giving the language as set out above a reasonable construction, can it be said the act violates the same? We do not believe so. We believe that the act embraces but one subject and matters properly connected therewith. It is clear that the subject

of the act is the liability of sureties on public depository bonds and the other provisions of the act are properly connected therewith. The provisions relating to the subject of the act are: The relief in certain cases from liability on such bonds; relief upon judgments obtained on such bonds, and upon evidence of indebtedness given in lieu of such liability; relief to certain sureties, their heirs, legatees, and devisees; providing for application of payments made on such bonds or judgments and a provision for the application and disposition of certain payments and the issuance and acceptance of warrants therefor. All of these provisions relate to and are properly connected with the subject matter.

As is said in the case of *Board* v. *Scanlan* (1912), 178 Ind. 142, 145, 98 N. E. 801, "It is not necessary that all matters connected with, or germane to the subject of an act shall be embraced in the title. It is sufficient that the title shall 'embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title.' (Const. Art. 4, §19), and that it is of such character as fairly to apprise the legislators and the public in general of the subject-matter of the legislation, so as to lead to inquiry into the body of the bill, or indicate some particular branch of legislation as a head under which the particular provisions of the act may reasonably be looked for, and it need not set out all the matters properly connected with, or germane to the subject-matter of the act." A large number of cases are collected and cited, in the foregoing case, on the proposition of law as just stated and we do not consider it necessary to cite them here.

In the case just cited the court also said, p. 147: "The word 'subject' in the Constitution (article 4 §19) indicates the thing about which the legislation is had, and the word 'matters' the incident or secondary things

necessary to provide for its complete enforcement," and citing many cases.

We believe that the title to the act in question fully meets the requirements of the constitutional provision as heretofore set out.

The second proposition of the appellant is: that the act is unconstitutional in that it violates Section 1 of the 14th Amendment of the Constitution of the United States and Article 1, Section 23 of the Constitution of Indiana. Section 1 of the 14th Amendment of the Constitution of the United States provides: ". . . No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . ." And Section 23, Article 1 of the Constitution of Indiana provides that: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens."

We can not believe that it can be seriously contended that the act violates Section 1 of the 14th Amendment of the United States Constitution. The plaintiff, in the instant case, is a board or agency of the state created by the state to enable it to perform and discharge certain governmental duties, and it has long been held that such corporations or agencies have no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator.

One of the latest pronouncements upon this subject is that by Justice Cardoza in the case of *Williams, etc.* v. *Mayor, etc.* (1932), 289 U. S. 36, 40, he said: "A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." Many cases of the United States Supreme Court are cited which sustain this proposition as stated by Justice Cardoza.

In the case of *Inland Steel Co.* v. *Yedinak* (1909), 172 Ind. 423, 433, 87 N. E. 229, where it was contended that certain statutes of the state of Indiana unlawfully abridged the privileges and immunities of the appellant as a citizen of the United States, in violation of the 14th amendment to the Federal Constitution, it was said by the court: "Appellant is a corporation, and not a citizen within the meaning of that term as used in this connection, and cannot invoke the benefit of this provision which was made for the protection of natural persons." Citing *Pembina, etc., Milling Co.* v. *Penn* (1888), 125 U. S. 181, 8 Sup. Ct. 737, 31 L. Ed. 650; *Schmidt* v. *City of Indianapolis* (1907), 168 Ind. 631, 80 N. E. 632, 14 L. R. A. (N. S.) 787, 120 Am. St. 385.

Neither do we assent to the proposition that the act in question grants to a class of citizens privileges and immunities which upon the same terms do not equally belong to all citizens and it does not therefore violate Section 23 of Article 1 of the Constitution of Indiana.

In the case of *Hammer* v. *State* (1909), 173 Ind. 199, 206, 89 N. E. 850, 24 L. R. A. (N. S.) 795, 140 Am. St. 248, 21 Ann. Cas. 1034, it was said: "Article 1, §23, of the Constitution of this State is the antithesis of the 14th amendment to the federal Constitution, for while the latter operates to prevent abridgment by the states of constitutional rights of citizens of the United States, the former prevents the State from granting privileges or immunities—that is, exemptions from otherwise common burdens—or advantages to any citizens or class of citizens which, upon the same terms—that is under like circumstances and conditions—shall not equally belong to all citizens. One section prevents the curtailment of the constitutional rights of citizens, and the other prohibits the enlargement of the rights of some in discrimination against others; but so long as

all are treated alike, under like circumstances, neither section is violated."

It is insisted by appellant that the act in question is class legislation for the reason that it does not release sureties on depository bonds executed in conformity with Chapter 222 of the Acts of 1907, as amended, executed prior to January 1, 1927; that it does not release sureties who receive compensation for becoming security on such depository bonds executed in conformity with Chapter 222 of the Acts of 1907 as amended; that it does not release any judgment obtained against a surety based upon a public depository bond executed prior to January 1, 1927; that it does not release a surety form liability upon a promissory note or other evidence of indebtedness given in lieu of his liability on public depository bonds executed prior to January 1, 1927; that it does not provide for the reimbursement of money paid by any surety by reason of being a surety on a public depository bond issued in conformity with said Chapter 222 of the Acts of 1907, as amended paid on any bond executed prior to January 1, 1927, and paid before March 1, 1932, and that the classification of persons affected by the act is unreasonable, unjust, and arbitrary.

Can the act in question be said to be of an unreasonable, unjust and arbitrary classification? If so, the act must be declared unconstitutional; on the other hand if the classification is a reasonable one it must be declared constitutional.

It cannot be questioned that the legislature has the power to make a reasonable classification of persons and things for the purpose of legislation. In determining the legality of classification for legislative regulation, the subject to be regulated, the character, extent, and purpose of the regulation, the classes of persons legally and naturally affected by

the regulation, and the particular classification and regulation adopted by the statute, should be considered.

It can not be questioned that the state may classify persons and objects for the purpose of legislation, if the classification is based on proper and justifiable distinctions, considering the purpose of the law. *Chicago, M. & St. P. R. R.* v. *Westley* (1910), 178 Fed. 619, 47 L. R. A. (N. S.) 97; *Selvage* v. *Talbott* (1911), 175 Ind. 648, 93 N. E. 855; *Carr* v. *State* (1911), 175 Ind. 241, 93 N. E. 1071. And the legislation, which in carrying out a public purpose is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not considered class legislation and is not repugnant to the constitutional inhibition. *C. C. C. & St. L. R. Co.* v. *Backus* (1892), 133 Ind. 513, 33 N. E. 421.

As to the right of the legislature to make classifications, this Court, in the case of *Bedford Quarries Co.* v. *Bough* (1907), 168 Ind. 671, 674, 80 N. E. 529, 14 L. R. A. (N. S.) 418, said: "The legislature may make a classification for legislative purposes, but it must have some reasonable basis upon which to stand. It is evident that differences which would serve for a classification for some purposes would furnish no reason for a classification for legislative purposes. Such legislation must not only operate equally upon all within the class, but the classification must furnish a reason for and justify the making of the class; that is, the reason for the classification must inhere in the subject-matter, and rest upon some reason which is natural and substantial, and not artificial. Not only must the classification treat all brought under its influence alike, under the same conditions, but it must embrace all within the class to which it is naturally related." Many cases are collected and cited to support the foregoing statement and with-

out question it is a fair statement of the law on this subject.

It can also be said that the question of classification is primarily for the legislature, and it can never become a judicial question except for the purpose of determining, in any given situation, whether the legislative action is clearly unreasonable, and before a court can interfere with the legislative judgment, it must be able to say that there is no fair reason for the law that would not require with equal force its extension to others whom it leaves untouched. 6 R. C. L. 385, and cases collected and cited.

In the case of *Lindsley* v. *National Carbonic Gas Co.* (1911), 220 U. S. 61, 78, in discussing the question of classification the court lays down four propositions as applicable thereto, as shown by repeated decisions of that court. He said: "1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary."

In the case of *Grainger et al.* v. *Douglas Park Jockey Club* (1906), 148 Fed. Rep. 513, 525, 8 Ann. Cases 997,

the court, in speaking of classifications, said: "There must be a real and substantial relation between the classification and that for which the statute or ordinance making it was enacted—the object which it was intended to accomplish, to wit, the public welfare."

In determining whether or not a basis of classification is reasonable it must be looked at from the standpoint of the legislature enacting it, the question of classification being primarily for the legislature. Legislative discretion in this matter is not subject to review by the courts, except to the extent of determining whether the classification adopted is arbitrary, unreasonable, and unjust. And, as in all other cases involving the validity of statutes, all reasonable doubts are to be resolved in favor of upholding the validity of legislation establishing a classification. 12 C. J. 1129-1130. Many cases are collected and cited from Indiana and other states in support of the foregoing statement of the law relative to classification.

One of the most recent cases of this court upon the subject of classification is that of the *School City of Elwood* v. *State ex rel.* (1932), 203 Ind. 626, 635, 180 N. E. 471, 81 A. L. R. 1027. The court said: "The classification to be constitutional must be reasonable and natural, not capricious or arbitrary; it must embrace all who naturally belong to the class, and there must be some inherent and substantial difference germane to the subject and purpose of the legislation between those included within the class and those excluded."

The case of *Fountain Park Co.* v. *Hensler* (1926), 199 Ind. 95, 101, 155 N. E. 465, is cited wherein this court said: "The question of classification is primarily for the legislature and does not become a judicial question unless it clearly appears that the legislative classification is not based on substantial distinctions with

reference to the subject-matter, or is manifestly unjust or unreasonable."

It is also contended by appellant that it is class legislation because it does not relieve sureties who are compensated. We can not believe this contention is taken seriously. The courts have uniformly made distinctions and classifications between paid sureties and those not paid. We deem it useless to discuss this question, but content ourselves by citing the case of *Royal Indemnity Company of New York* v. *Northern Granite & Stone Company* (1919), 100 Ohio St. 373, 126 N. E. 405, 12 A. L. R. 378. The latter report contains a complete annotation of the liability of the paid surety and the gratuitous surety company. Guided by the law as heretofore set out relative to classification, can it be said that the act in question violates either Amendment 14 of the Constitution of the United States or Section 23, of Article 1 of the Constitution of Indiana?

The original Depository Act was passed in 1907. Prior to this time there was no depository law in the state. The legislature then passed the act providing for a system of public depositories for the deposit of public funds, and at that time made a classification of the funds. Not all funds were included. Municipal sinking funds and some others were not included. All funds, however, raised by general taxation were included. The Act also made a classification as to sureties. It provided that in case of state funds there should be not less than seven freeholders of the state sign the bond, but for all other funds there should not be less than five freeholders of the state required. The bond given should be for a sum not less than 25 per cent greater than the maximum amount of the funds to be held on deposit at any one time, and, if a surety company bond, a sum not less than the amount of funds to be held at

any one time. And it also provided in lieu of a personal or surety company bond, road bonds, bonds of the United States, or bonds of the state of Indiana might be accepted. An Act of 1925, p. 373, changed the number of sureties required, and provided that state funds should be protected by a surety company bond, and by the Act of 1932 (Special Session), p. 141, the provisions for giving security for public funds were repealed and a state sinking fund to be known as the "state sinking fund for public deposits" was passed. We do not think it can be questioned that the legislature had the power to make the foregoing classification to protect public funds. This was a legislative function over which the courts have no control.

Because all public funds of the municipalities of the state were not required to be deposited under the Depository Act of 1907, does not make the act invalid. The legislature certainly had the right to enact the act of 1907; prior to 1907, the state had never enacted such a law, and, if it had the right to enact such a law, and this is not questioned, then it had the right to say what funds should be within the law, and the manner of governing the same. It was purely a matter a legislative discretion.

The appellant strenuously contends that the act is class legislation for the reason that it limits its application to January 1, 1927, that is to say no relief is given those obligated on depository bonds prior to January 1, 1927.

We think the legislature has the power to limit the application of legislation as to respect to time, and has often done so. For instance the legislature has provided for the limitation of actions and the time in which they can be brought, and provided that some must be brought within six years, some within five years, some within ten years. For instance, on accounts and contracts not

in writing the action must be brought within six years. It has never been contended, so far as we know, that because one who has an account or contract and can not bring an action upon the same the next day after the six years has expired, that it is class legislation and void. In the very necessity of things the legislature must have the right to limit the application of legislation as to time. And this question is primarily one for the legislature, and unless it can be said that such legislation is arbitrary, unjust, and unreasonable, this court cannot say it is invalid.

One of the cardinal rules, as heretofore stated, relative to classification is—that if a state of facts can reasonably be conceived that would sustain the classification—the existence of that state of facts at the time the law was enacted must be assumed. With this rule as to construction in mind what may we say the legislature might have had in view when the act was passed? In our judgment there is no question as to what the legislature had in mind and the purpose of the legislation. The United States Congress and the legislatures of every state in the Union have been confronted with relief and emergency measures growing out of the economic conditions of the country. We must take judicial notice of the fact that for the past few years our country, and for that matter the whole world, has been shaken to its very foundation by a devastating financial crisis. Emergencies of many kinds have had to be met in order to save the government itself and the people from a complete breakdown and ruin.

The General Assembly at the Special Session of 1932, passed an act, known as the "State Sinking Fund for Public Deposits." This act did away with personal and corporate surety bonds and provided a sinking fund to be provided for by a diversion of interest payments on public funds. What reasons prompted this legislation?

Evidently, it was prompted by the fact that the legislature took knowledge of the conditions then prevailing that it had become almost impossible for those entrusted with public funds to secure either individual or surety company bonds so that they might comply with the Public Depository Law. Banks were failing and had been since 1927; private individuals by the thousands were becoming bankrupt and it became necessary to enact the law of 1932, in order to secure public funds. It is a well known fact that the bank failures of this state began in 1927, and continued in increasing numbers until 1933.

Under the Public Depository Act of 1907, the designation of depositories is biennial and the first meeting was on the 1st Monday in January, 1909, and biennially thereafter. And the 1st Monday of January, 1927, was the biennial meeting for the designation of depositories and the depositories were required to give bonds. Those who signed the bonds were liable for two years and until a new bond was given or the public funds secured by the bond were repaid.

As a matter of common knowledge, we know that surety companies were refusing to go upon bonds required by the Public Depository Act; that these individuals who were already on bonds were, in a sense, in order to protect themselves, required to renew the bonds they were obligated upon, and other individuals became obligated from a sense of duty in order to prevent their local government from breaking down.

The legislature of 1933, when the act in question was passed, evidently had the foregoing facts in view when the application of the act was limited to on or after January 1, 1927. Can this court say that such classification is unreasonable, arbitrary, and unjust? Can we say that such a classification is not based upon proper

and justifiable distinctions, considering the purpose of the law? We can not say that it does not have some reasonable basis to rest upon. It may not be made with mathematical nicety and it may result in some inequality, but as said in the case of *Lindsley* v. *National Carbonic Gas Co., supra,* this will not and does not make the act invalid.

The appellant contends that the act violates Section 10, of Article 1 of the Constitution of the United States, and Section 24, of Article 1 of the Constitution of Indiana.

Both of these sections provide that no law shall be passed impairing the obligation of contracts.

Does the act impair the obligation of a contract?

The appellant, in the instant case, is a political subdivision of the state, and a creature of the legislature and acts as the agent of the state. It acts pursuant to statutory authority. The real contracting party is the state and it has been held in many cases that the state may withdraw the power to so contract, that it may release the liability created and without the consent of the agent. And by the great weight of authority this does not amount to the impairment of contracts as provided for in the Federal and State Constitutions.

In the case of *Central Union Telephone Company et al.* v. *Indianapolis Telephone Company* (1919), 189 Ind. 210, 230, 126 N. E. 628, the Public Utilities Act was under discussion. By section 95½ of the Public Utilities Act, the power to give or to withhold consent to the sale of a franchise was withdrawn by the legislature from all the municipalities of the state, and that power was delegated to the Public Service Commission. Upon this question the court said: "The power of the city to make the contract, and to enforce any right thereunder was a power derived from the people. Such power, however, does not come directly from the people to the

city; but it comes indirectly by delegation from the general assembly, to which body the people have, by their Constitution, entrusted their entire power in such matters. When the state withdraws any such delegated power, it acts in behalf of the people of the state. The people residing within the corporate limits of a municipality have no ground to complain of the exercise of such a power by the legislature in behalf of the people of the entire state. They are not thereby deprived of any supposed constitutional right of local self-government.

"The municipality itself, which as a mere creature of the legislature, is in no position to complain of the action of that body in reassuming powers previously delegated. The obligation of no existing contract is impaired by such an act and no vested rights are thereby disturbed." The case of *Lucas* v. *The Board of Commissioners of Tippecanoe County* (1873), 44 Ind. 524, 529, was cited with approval. This case went to the Supreme Court of the United States, and was affirmed. The Acts of 1869 (Spec. Sess., ch. 44) authorized aid in the construction of railroads by counties and townships taking stock in, and making donations to railroad companies. In 1872, the legislature passed an act providing that railroads which had received aid from counties or townships by taxation should issue stock to the parties who had paid the taxes to the amount by them respectively paid; and the act provided the issue of stock to a taxpayer should operate to cancel *pro tanto* the stock held by any county or township under the provisions of the statute of 1869.

In passing upon the questions involved the court said, p. 529: "Counties and townships, however, are not *private corporations*, and the rules of law applicable to them are not, in all respects, the same as those which are applicable to private corporations. They exist under

general laws enacted by the legislature, by which the territory of the State is divided into political divisions, as the convenience of the government may suggest and require; . . . Their functions are of a public nature, designed for local self-government, and there is, therefore, no room, as there may be in case of private corporations to imply any contract between them and the State in their organization as corporate bodies, except such as may arise from ordinary considerations of good faith. . . . Being a mere agency of government, it is evident that the municipality cannot itself have that complete and absolute control and power of disposition of its property which is possessed by individuals over their own. For it can hold and own property only for corporate purposes, and these purposes are liable at any time to be so modified by legislation as to render the property no longer available. Moreover, the chartered rights may be altogether taken away, . . ."

The Supreme Court of the United States, in affirming the above case, said p. 114 (93 U. S.) : "But between the State and municipal corporations, such as cities, counties, and towns, the relation is different from between the State and the individual. Municipal corporations are mere instrumentalities of the State, for the convenient administration of government; and their powers may be qualified, enlarged or withdrawn at the pleasure of the legislature."

One of the leading cases in this country upon questions involved in the instant case is that of *McSurley* v. *McGrew* (1908), 140 Iowa 163, 168, 118 N. W. 415, 132 Am. St. R. 248. This case involved sureties on the bond of a county treasurer. The bank in which deposits had been made failed, and the supervisors of the county made a settlement with the county treasurer and released him from all liability. On February 28,

1907, the legislature passed a curative act, purporting to legalize the acts of the boards of supervisors in settling and releasing the treasurer. In this case the court, relative to the curative act, said: "If nothing but private rights were involved, it is manifest that the act could not be sustained. But the matters involved here are public, and the county of Van Buren is the real party in interest. A county, while a body corporate under our law, is a subdivision of the State, created for administrative and other public purposes, owes its creation to the State, and is subject at all times to legislative control and change. No citizen has any vested rights in or to its revenues. These may be changed, diverted to other uses, or taken away, and no one may complain on the theory that his interests have been affected or any contract rights destroyed. The Legislature might have permitted the deposit of county funds in banks and absolved the county officers from any liability on account of such deposits. Neither the county nor any of the inhabitants thereof had any vested interests in the funds coming into the county treasurer's hands. . . . It is said that, in the matter of the application of revenues, the legislative conscience will not be interfered with by the courts, and that they may be diverted to the benefit of private individuals if the Legislature is so advised. . . . The Legislature undoubtedly had power in the first instance, to absolve its county treasurer from liability when he deposited money in solvent banks; and, as no contract rights are involved, save as the statute created such right, there seems to be no constitutional objection to passing a retroactive law which would operate upon past transactions. . . . the Legislature had the power, by proper enactment, to relieve defendant of his liability under the bond, a liability which was created primarily by the Legislature, and which, in so far as the State and the various sub-

divisions thereof are concerned, may be changed at pleasure." (A large number of cases from courts of the various states and the Supreme Court of the United State are collected and cited to the foregoing propositions.) Among the cases cited is *Mount* v. *State* (1883), 90 Ind. 29, 40 Am. St. R. 192. The opinion in this case was written by Judge Byron K. Elliott. A trustee of a township had deposited money of the township in a bank which failed, and the trustee reimbursed the township. The legislature passed an act to reimburse the trustee. The court said: "It may be true that the policy of refunding money to an officer who has lost it by the failure of a bank is a vicious one and to be condemned, but it affords no ground for overturning a legislative enactment. Courts can not overthrow legislative acts upon the ground that they are vicious in their policy or evil in their tendencies. . . . Statutes must stand unless found repugnant to some express provision of the Constitution. . . . Reimbursing a public officer for the loss of public funds, occurring while he is engaged in discharging the public official duties, can not be deemed an appropriation to private purposes. It was decided in *Board, etc.,* v. *McLandsborough,* 36 Ohio St. 227, that the Legislature may exonerate from responsibility a public officer who has lost public money, and that there is no constitutional provision infringed in the adoption of such an act. The court declared that such a power was purely a legislative one, and added that, 'Indeed, it is difficult to fix any limit to the power of the General Assembly in this respect, where the funds so lost were raised by taxation, which, as we have said, is clearly a legislative power.' . . . Township officers are agents of the sovereign power, and the money in their hands is, for public purposes at least, in the control of the sovereign. It is a mistake to suppose that money derived from the taxa-

tion of the citizens of a township or county is beyond legislative control."

There are cases holding to the contrary doctrine as stated above, but the great weight of authority seems to sustain the law as laid down by Judge Elliott, in the case of *Mount* v. *State, supra.*

We have two other Indiana cases which seem to be contrary to the cases of *Mount* v. *State, supra,* and *Board* v. *Lucas* (1876), 93 U. S. 108, 23 L. Ed. 822. These cases are respectively *McClelland, Trustee* v. *State ex rel. Speer* (1894), 138 Ind. 321, 37 N. E. 1089; and *Johnson* v. *Board, etc.* (1894), 140 Ind. 152, 39 N. E. 311.

The facts in the McClelland case, *supra,* are different from those in the instant case. In the McClelland case the funds, except a small item, were state school funds which came into the hands of the trustee for common school purposes and were not raised by general taxation and the court held that the legislature could not pass an act relieving the trustee from loss in such a case, and impose upon the citizens and taxpayers of the township the burden of making good the loss. The court in this case expressly said that it differs from the Mount case, *supra,* and the case of *Board, etc.,* v. *McLandsborough, supra,* and it further said, p. 338: "While we do not approve the doctrine expressed, (meaning the above cases) that the Legislature may, under any circumstances, relieve a trustee from the obligations of his contract, yet, in neither of the cases cited, does the court recognize a right in the General Assembly to legislate a debt upon the people to be liquidated by taxation, unless the funds lost were 'raised by taxation'; and they must have been raised by local taxation on the political division to be charged with the burden." The Mount case was not overruled.

In the Johnson case, *supra,* it appears that the appellant, Johnson, as treasurer of Randolph county had

money of the county on deposit in a certain bank in said county which failed and that there was a loss of $2,000. The legislature of 1891 passed an act releasing Johnson and his sureties for the loss sustained. It is not shown from the facts as stated in the opinion what funds made up the $2,000, and whether or not it had been raised by general taxation. The opinion in the case, considering the question involved, is very short and only one case cited, the case of *McClelland, Trustee* v. *State, ex rel., supra,* and in our judgment it is not in point. For in that case the money lost belonged to the school fund which was not raised by general taxation. The court held that the Act of 1891 violated the Constitution in that it impaired the obligation of a contract. Neither the Lucas nor the Mount cases, *supra,* were mentioned. The Johnson case, *supra,* is certainly against the weight of authority and has never been followed to our knowledge, but has been criticised by other courts, and insofar as it is in conflict with this opinion it is overruled.

The case of *Miller* v. *Henry* (1912), 62 Ore. 4, 7, 124 Pac. 197, 41 L. R. A. 97, is a well considered case upon questions here involved. A county treasurer of the state of Oregon lost county money in a bank which failed. The legislature passed an act relieving him from the loss. The court said: "It is contended that the bond of the treasurer is a contract with the county, and that this act releases him from the obligation of the bond, and therefore impairs the obligation of the contract. We cannot assent to this view of the law. A county is a subdivision of the State, created by the legislature for administrative purposes, and except as limited by the Constitution is subject at all times to legislative control. No citizen has any vested right in its revenues. These may be changed or diverted from one public use to another by legislative authority, and no citizen can complain that his contract rights are thereby impaired. The

legislature might in the first instance have directed that county funds be deposited in banks, and in such event, that the treasurer should not be liable for their loss or diminution. What the legislature can do in the first instance it can afterwards ratify. Its action does not involve a question of power, but of public policy, of which it must be the sole judge."

In our judgment the act in question does not violate any constitutional provisions of the Federal or State Constitutions relative to the impairment of contracts or vested rights.

In addition to the authorities cited above on this question, we wish to cite, *State* v. *Baltimore & Ohio R. Co.* (1842), 12 Gill & Johnson (Md.) 399, 38 Am. Dec. 317; *Bauer* v. *North Ark.* (1925), 168 Ark. 220, 270 S. W. 533, 38 A. L. R. 1507.

It is further contended by appellant that the act in question violates §§22 and 23 of Article 4 of the State Constitution. We can not assent to this contention. It is clearly not a local law, it is uniform throughout the state. *Strange* v. *Board of Commissioners of the County of Grant* (1910), 173 Ind. 640, 91 N. E. 242. It is not a special law regulating township business. "The term 'business,' when applied to a public corporation, signifies the conduct of the usual affairs of the corporation, and the conduct of such officers as commonly engage the attention of township and county officers." *Mount, Trustee* v. *State, supra.* And moreover it is an act regulating the state's business and not the business of the township. The appellant is merely an agency of the state.

Neither does the act violate §1 of the 14th Amendment of the Constitution of the United States, nor §21 of Article 1 of the Constitution of Indiana. There is no taking of the property of a person without due process of law; the appellant had no vested rights in and to the funds in question.

In passing upon the questions involved, we have not been unmindful of the rules governing the constitutionality of statutes. It is useless to cite authorities to the proposition that the power of the General Assembly to enact laws is subject to no restrictions save those imposed by the State and Federal Constitutions; that its laws are presumed to be valid, and they are to be upheld by the courts, not only when clearly authorized, but in all cases of doubt, and until it is made clearly to appear that they contravene some constitutional provision. And, furthermore, a statute which will admit of two interpretations, one valid and one invalid, will receive the interpretation sustaining its validity, and it is no part of the duty of the court to be astute in order to invalidate a statute, but on the other hand it will strive to so interpret it as to sustain its validity and give effect of the intention of the legislature.

It may be that the act in question is unwise, as a matter of public policy, but as to this we have nothing to do. This was a matter to be determined alone by the members of the legislature. It was enacted by the people through their chosen representatives. It is for us to interpret and we are of the opinion that the act is constitutional, and that the judgment should be affirmed.

Judgment affirmed.

Treanor, J., dissents.

Myers and Fansler, J. J., not participating.

### DISSENTING OPINION.

TREANOR, J.—"The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." Indiana Constitution, Art. I, §23.

The foregoing section of our Constitution is a clear,

understandable restriction upon the power of the General Assembly. By virtue of this section the General Assembly is utterly powerless to grant immunities to any citizen or class of citizens "which upon the same terms shall not belong to all citizens." If the section means anything at all it means that an immunity cannot be granted to a citizen or class of citizens unless the same is available to all citizens who comply with the terms upon which the immunity depends. Obviously, if the legislative act in itself and by force of its own express provisions excludes all citizens except one or a class from the possibility of enjoying the immunity, such an act violates §23, *supra*.

The relief provisions of the act (Acts 1933, ch. 78, p. 488) may be summarized as follows:

I. They apply only to those persons who became obligated as freehold sureties without compensation upon the bonds of banks, banking institutions or trust companies to enable these institutions to obtain deposits of public funds deposited pursuant to the depository statute of 1907, as amended. (Acts 1907, ch. 222, p. 391, §12611, et seq. Burns Ann. Ind. St. 1926, §61-601, Burns 1933, §13805, Baldwin's 1934).

II. The relief provisions are further restricted to those sureties who are sureties for banks, banking institutions or trust companies which were designated as public depositories on or after January 1, 1927.

III. The sureties are relieved from liability; (a) upon the bond, (b) upon a judgment recovered upon the bond obligation, (c) upon promissory notes or other evidence of indebtedness given in lieu of either the bond or judgment obligations.

IV. In case any surety favored by the act has made any payment or payments "within a period of one year prior to the taking effect of this act" he is entitled to receive "credit warrants" which "shall and must be ac-

cepted by said treasurer at any time to the amount thereof in payment of any general taxes that may be due and payable after January 1, 1934, to said municipal corporation or political subdivision from said surety or his transferee, and for no other purpose."

The following classes of sureties are excluded from the grant of relief:

I. Uncompensated freehold sureties on bonds of depositories of the municipal sinking funds.

II. Uncompensated freehold sureties on bonds of depositories of the library building and ground funds of school cities.

III. Uncompensated freehold sureties upon bonds covering public funds where such bonds were not given "pursuant" to the depository acts and under circumstances rendering the public officer liable as an insurer of such funds.

IV. All uncompensated freehold sureties who became such on the bonds of banks, banking institutions and trust companies designated as public depositories prior to January 1, 1927, but who are otherwise within the favored group.

V. Freehold and corporate sureties who received compensation for assuming the risk of surety.

VI. Those who come within the group relieved but who paid their obligations more than a year prior to the taking effect of the act are excluded from the right to demand and receive "credit warrants" for their payments.

Does the act in question grant "privileges or immunities" to any "citizen or class of citizens?" It clearly grants an immunity. The individuals benefited are legally bound to make good certain losses. These obligations are just as legally binding as any citizen's promissory note or the judgment secured thereon. The

effect of the statute, and its declared purpose, is to grant an immunity to the small number coming within its purview, from all legal liability resulting from their promises as freehold sureties.

Does this immunity from contractual liability belong to all citizens upon the same terms upon which it is granted to the carefully selected group of sureties described in the relief act? Obviously it doesn't. No other citizen who is under contractual liability can obtain a discharge under the terms of the act. In fact only a relatively few freehold sureties out of a larger class of sureties who are under contractual liability to municipal corporations are granted immunity.

But it is contended that the classification adopted is such that it avoids the prohibition of Art. I, §23. It is important to note that Art. I, §23, does not forbid the granting of privileges and immunities to a citizen or class of citizens. The vice which. is declared against is the exclusion of other citizens from the enjoyment of these privileges or immunities. It does not follow that every statute violates Art. I, §23, merely because its effect is to benefit some citizen or class of citizens; to be obnoxious to Art. I, §23, *supra*, it must also discriminate against other citizens in respect to the enjoyment of benefits which inure from the operation of the statute. The foregoing distinction is given practical effect through the formula of classification. This is admirably stated in the opinion in *Davis Construction Co.* v. *Board, etc.*, (1922), 192 Ind. 144, 150, 132 N. E. 629, 21 A. L. R. 557:

"And while some clasification of the subjects of legislative action is necessary, and a reasonable classification based upon actual differences which inhere in the different subjects and embrace all within the class and the reason for the classification will be upheld, a classification, to be valid, must be based on substantial distinctions which make one class so different from another as to suggest the ne-

cessity for different legislation with respect thereto. An artificial, arbitrary, and unreasonable classification, as by designating certain individuals by name or description out of a larger number whose situation and needs do not differ from theirs, is forbidden by the constitution. *Bedford Quarries Co.* v. *Bough* (1909), 168 Ind. 671, 674, 80 N. E. 529, 14 L. R. A. (N. S.) 418; *Railroad Com.* v. *Grand Trunk, etc., R. Co.* (1913), 179 Ind. 255, 262, 100 N. E. 852; *Sperry & Hutchinson Co.* v. *State* (1919), 188 Ind. 173, 181, 122 N. E. 584."

The foregoing makes clear that a classification for legislative treatment cannot avoid the prohibitive force of Art. I, §23, if the classification results in discrimination against individuals not included within the class; and discrimination does exist when the classification is not based upon "substantial distinctions which make one class so different from another as to suggest the necessity for different legislation with respect thereto;" or when the classification takes the form of "designating certain individuals by name or description out of a larger number whose situation and needs do not differ from theirs."

In short, a statute which grants benefits to, or removes disabilities from, any group less than "all citizens" violates Art. I, §23 unless the group selected (i. e. classified) to be affected by the act differ so much "in their situation and needs" from those excluded that the provisions of the act and the object sought therein would be inappropriate to the situation and needs of those excluded. In that case there could be no real discrimination and the advantages conferred could not in any true sense constitute "privileges or immunities" as against all other citizens.

Tested by the foregoing the sureties relief act of 1933 is a palpable violation of Art. I, §23. Keeping in mind that the vice of a "privileges or immunities" statute is the discrimination between those who are included and

those who are excluded from the benefits conferred, it follows that it is not material in the instant case as respects Art. I, §23 that the obligations of the small group of sureties ran to municipal corporations. The "situation and needs" of every person in Indiana who is under a legal obligation to pay money would seem to be substantially the same as those of the sureties whom the act of 1933 purports to relieve from money obligations; and certainly the relief granted would be as appropriate to and as advantageous to all those obligors not included in the favored group.

There are thousands of personal, non-compensated sureties in Indiana on notes and other forms of indebtedness whose interest in being relieved of liability is identical with that of the sureties who are relieved by the terms of the act in question. And it is obviously impossible to phrase even a formal distinction of interest between the favored group of freehold, non-compensated personal sureties and other groups of freehold, non-compensated sureties who are obligated on bonds to secure public funds which are deposited pursuant to the legislative acts other than the act of 1907, as amended, *supra*.

In the opinion of the writer there is no basis for a classification which excludes compensated personal or corporate sureties from relief. It is true, as stated in the prevailing opinion, that the courts have construed the contract of suretyship more strictly against a corporate surety than against a gratuitous surety; and also have limited the effect of certain equitable defenses when invoked by a corporate surety. In construing the corporate surety's contract more strictly against the surety the courts have applied the general rule that all ambiguities in a written instrument are construed more strictly against the one who prepares it; and in the

matter of equitable defenses the courts have recognized that the corporate surety is in a better position to protect itself against improper conduct on the part of the principal and obligee. The distinctions made by the courts have a rational basis in the actual factual differences between the situations of the typical gratuitous surety and the corporate surety. But the factual differences are not such as to supply a rational basis for a classification for the purpose of completely releasing the gratuitous surety from all liability.

The writer believes that the reasoning and result of the prevailing opinion cannot be reconciled with the decision and opinion in *Davis Construction Co.* v. *Board, supra.* In that case this court held that a certain act of the General Assembly providing for the relief of highway contractors from the obligations under their contracts, because of conditions resulting from the World War, was unconstitutional as being in violation of Art. I, §23, of the Indiana Constitution. The opinion of the court, after pointing out various classes of contractors who were excluded from the benefit of the statute, continued as follows, p. 149:

"Without considering or undertaking to decide whether or not the legislature might have power to relieve contractors for the construction of public works from the threatened consequences of a shortage of labor and materials, caused by the war, by consenting that their contracts should be canceled and that any loss due to those conditions should be imposed on the taxpayers (as to which we decide nothing), the question remains whether or not it has power to enact a statute for the relief only of those contractors who entered into contracts with boards of commissioners for the construction of highway improvements and bridges, 'under and pursuant to' certain specified sections, twenty-nine in number, of one designated statute, out of many acts which provide for building improved highways, and out of a far greater number of acts which

provide for letting public construction work by contract.

"We think that this question must be answered in the negative. The constitution of the State of Indiana provides as follows: 'The general assembly shall not grant to any citizen, or class of citizens, privileges and immunities which, upon the same terms, shall not equally belong to all citizens.' Art. 1, §23, Constitution. . . .

"The limited number of persons and firms who had entered into contracts prior to June 1, 1917, to do a particular kind of work on highways and bridges in process of construction under the specified sections of the designated statute, and who had not yet completed that work before March, 1919, when the statute under consideration was approved, could not be more clearly pointed out if they were mentioned by name. The war had ended more than four months before the statute was enacted, and the date prior to which the contracts must have been entered into was almost two years past. But of the many persons having contracts to do grading, ditching and concrete work, on highways and elsewhere, in the State of Indiana, who were affected in the same way and substantially in the same degree as those persons and firms, by the increased cost of labor, teams, railroad freights, lumber, sand, gravel, broken stone and cement, but who did not have contracts to build highways under §§62-90 of the particular statute, or who took contracts under those sections, but performed them (at whatever loss) before this statute was enacted, none could possible bring themselves within the statute or obtain relief under it.

"Counsel for the appellant seek to uphold the statute against the charge of making an unreasonable classification of subjects by terming it an exercise of 'police power.' But a statute which assumes to relieve a few contractors for the construction of certain kinds of public improvements ordered under particular sections of a single statute, from the obligation of their contracts entered into prior to a date named, by requiring the taxpayers of certain townships to bear the loss which would otherwise fall upon the contractors, cannot be upheld as basing its classification on reasons of public safety, public health, public morals, or public welfare, so

as to justify a classification not otherwise permissible. *State* v. *Wiggam* (1918), 187 Ind. 159, 161, 118 N. E. 684; *Cleveland, etc., R. Co.* v. *Schuler* (1914), 182 Ind. 57, 105 N. E. 567, L. R. A. 1915A 884."

The foregoing declarations of this court respecting the contractors' relief statute of 1919 apply with equal force to the sureties relief statute of 1933. Both acts are irreconcilably in conflict with Art. I, §23 of the Constitution of Indiana and neither can be justified as an exercise of police power.

The Constitution of Indiana also provides:

"No ex post facto law, or law impairing the obligation of contracts shall ever be passed." (Art. I, §24).

It is well established that the *ex post facto* clause is limited to criminal laws; but in the opinion of the writer the surety relief act of 1933 violates the constitutional prohibition against impairment of the obligation of contracts. In respect to this question the substance of the argument of the proponents of the act is as follows:

Political subdivisions such as the county, the township, and the city or town are instrumentalities or agencies of the state, mere administrative agencies. A contract between one of these agencies and a depository of public funds and its sureties is a contract between the state as one party and the depository and its sureties as the other. The General Assembly speaks for the state and when it declares that the sureties are relieved it is merely the state cancelling an obligation due to it. Consequently, there is no legal impairment of the contract, merely a consent by the obligee to the cancellation of an obligation. The funds raised by local taxation belong to the state and neither the local municipal subdivision nor the taxpayers therein have any legal interest which can be asserted against the declared

wish of the General Assembly speaking for the state.

If the foregoing assumptions are legally sound it follows that the General Assembly, without violating any right of the local taxing unit or the taxpayers therein, can divert funds raised by local taxation for local purposes to state purposes; and that it can use funds raised by a local levy for local needs in Indianapolis or any other municipality for any purpose for which it could raise money by a state levy.

The fundamental fallacy of the non-impairment argument is that its major premise does not exist in fact or in law. The major premise is that all counties, cities, towns and townships are mere administrative agencies of the state as a governmental unit in the principal-agent sense. Whereas the present reality, factual and legal, is that the governmental functions of Indiana are performed partly by the state as a governmental unit and partly by the local municipal corporations as independent governmental units, and not as agents of the state. When we think of state government as the sum total of all governmental functions, state and local, it is accurate to speak of local units as governmental agencies of state government; but they are not agents of the state in the sense that their acts are the acts of the state as a principal. We do have state agencies in the principal-agent sense. The State Highway Commission is a state agency; but it is also an agent of the state in the principal-agent relationship because it does in law represent the state as a political and governmental unit and binds the state within the scope of its powers.

Under our present statutes the counties, cities, towns, and townships are treated as private corporations as respects the business and financial phases of local government. In this connection it is significant that the Constitution carefully differentiates the state from local

units in the matter of indebtedness. This is done by the following:

"No law shall authorize any debt to be contracted, on behalf of the State except in the following cases: To meet casual deficits in the revenue; . . . to repel invasion, suppress insurrection, or, if hostilities be threatened, provide for the public defense." Art. X, §5.

". . . ; nor shall the General Assembly ever, on behalf of the state, assume the debts of any county, city, town or township, nor of any corporation whatever." Art. X, §6.

"No political or municipal corporation in this state shall ever become indebted in any manner or for any purpose to an amount in the aggregate exceeding two per centum . . ." Art. XIII, §1.

In view of the foregoing, the business and financial affairs of political and municipal corporations, insofar as they relate to indebtedness, must be kept independent of the state and no indebtedness contracted by such corporations can become an obligation of the state. Consequently the local unit cannot be an agent of the state while entering into a contract to incur indebtedness. The burden resets upon the municipal or political corporation and must be paid out of public funds raised by local taxation. The state has no liability in the matter. Yet, according to the proponents of the relief act, if a municipal or political corporation, acting under statutory authority should incur an indebtedness, and should build up a sinking fund by local taxation to discharge the indebtedness, and if this fund should be deposited with a public depository under a contract between the corporation as one party and the depository and its sureties as the other, by the terms of which the depository and sureties agree to repay the sum deposited, the General Assembly can release the depository and the sureties from their contractual obligation without impairment of the obligation of the contract for the reason that the corporation and the taxpayers therein,

who must make good the sum involved, have no legal interest in the contract for the repayment of the deposit.

Under the present laws of the state the municipal and political corporations exercise ordinary powers of private corporations while carrying on the financial and business affairs of local government. They have the capacity to contract and must meet their financial obligations. The usual source of income to meet local obligations is from taxation. In levying taxes for local governmental expenses and in contracting with depositories for the safety of the funds raised by local taxation for local purposes municipal boards and officers represent the municipal corporations and the people therein and not the state; and the contracts with depositories and sureties for the repayment of funds are for the benefit of the municipal corporation and to insure its ability to meet its own obligations in which the state has no interest and for which it has no obligation.

In the opinion of the writer, under the laws of Indiana, our municipal and political corporations are vested with such independent power over and interest in, the financial and business affairs of local government that an act of the General Assembly which releases third parties from their legal obligations to pay money to the corporation constitutes an impairing of the obligation of contract, when such obligation is imposed by a contract, entered into under statutory authority, for the purpose of protecting funds raised by local taxation, to meet the needs of local government.

The writer recognizes that the General Assembly can change the powers of political and municipal corporations and destroy their character of private corporations. There is nothing in the Constitution which requires the General Assembly to confer upon these corporations powers to contract, or even to levy and collect local taxes for support of local government. The Gen-

eral Assembly doubtless has the power to abolish these municipal and political corporations and to create a centralized unitary state administration and to divide the state into administrative districts with administrative agents over each district. To supplement such an arrangement it could abolish local taxes and pay all expenses of government from a state tax. When that is done the nature of the state government will be such as to support the argument that local units are mere agents of the state government and that contracts with them are contracts with the state. But as long as the General Assembly creates municipal and political corporations, as agencies of government, with powers and attributes of private corporations we must give effect to these powers.

In support of the foregoing I wish to quote the following from *Lucas* v. *Board of Commissioners of Tippecanoe County* (1873), 44 Ind. 524, 531, a case which is strongly relied upon in the briefs supporting the validity of the relief statute:

> "It has been said by an eminent modern law writer, that the legislative power of the state controls and disposes of the property of the state. How far it can also dispose of that of those agencies of government which it has created and endowed with corporate powers, is a question which happily there has been very little occasion to discuss in the courts. Being a mere agency of government, it is evident that the municipality cannot itself have that complete and absolute control and power of disposition of its property which is possessed by individuals over their own. For it can hold and own property only for corporate purposes, and these purposes are liable at any time to be so modified by legislation as to render the property no longer available. Moreover, the chartered rights may be altogether taken away, and in that case the legislature has reprived the corporation of its property by depriving it of corporate capacity to hold it. And in many ways in which the corporation

holds and enjoys property, the legislature must possess power to interfere with its control at least incidentally; for the mere fact that the corporation possesses property can not deprive the State of its complete authority to mould and change the corporate organization and enlarge or diminish its powers, which it possessed before. But whether the State can directly intervene and take away the corporate property, or convert it to other uses than those for which it was procured, or whether on repealing a charter of incorporation, it can take to itself the corporate property and dispose of it at its discretion, are different questions from any raised by the indirect and incidental interference referred to. Cooley Const. Lim. 235. . . .

"Judge Cooley, in the summing up of his views on the question as to the power of the legislature over the property of municipal corporations, says, that the rule upon the subject seems to be this: when corporate powers are conferred, there is an implied compact between the State and the corporators that the property which they have the capacity to acquire under their charter shall not be taken from them and appropriated to other uses. If the State grants property to the corporation, the grant is an executed contract, which cannot be revoked. The rights acquired, either by such grants or by any other legitimate mode in which such a corporation can acquire property, are vested rights, and cannot be taken away. Nevertheless, when the corporate powers are repealed, the corporate ownership ceases; and by modification of corporate powers, the legislature may in other cases affect and divest the rights of individual corporators, so far as they can be said to have any rights in public property. And in other ways and by direct intervention, the legislature may exercise control over the disposition and use of property, subject to the restriction, that it must not be diverted to a use substantially different from that for which it was acquired."

The case of *Lucas* v. *Board, supra,* is especially relied upon as supporting the validity of the relief act. The facts and actual holding ought not to give much comfort to those relying upon it. That case arose out of the

following facts: Under an act of the General Assembly entitled "An Act to authorize aid to the construction of railroads by counties and townships taking stock in, and making donations to railroad companies," approved May 12, 1869, Acts of 1869, p. 92, and in conformity to that act, a tax was voted and collected in Tippecanoe county in aid of a railroad. The county commissioners paid for and received certificates of stock. Later an act was passed to divest the county of the ownership of the stock. The purpose and effect of the act can be easily seen from the following, p. 528:

"The question presented is as to the constitutionality of the act which we have set out, the act of December 17, 1872. It is urged by counsel for the appellees that the legislature has not the power to pass a law to take the railroad stock from the county, after it has been subscribed and paid for by the county out of the fund raised by taxations, and transfer it to those from whom the money was collected, and in the event that they do not apply for it, to vest it in the townships for school purposes."

The following shows the inapplicability of the decision and reasoning of the court to the instant case, p. 544:

"The tax, when collected, does not go into the county treasury as such. It does not become the property of the county. It is collected for a specific purpose, and the county officers are appointed to collect and finally devote the money to the purpose for which it is raised. The commissioners may take stock in the railroad company in the name of the county, or donate the money to the company 'for the purpose of aiding in the construction of such railroad.' The tax could not be collected for the mere purpose of taking the stock. But it might be for the purpose of aiding in the construction of the railroad; and as a mode of appropriating the money, the county commissioners are authorized to take stock in the name of the county, and pay the money over to the company. It does not thereby become the property of the county, in the sense that it would if purchased with county funds, and the

primary object was the purchase of the stock for its own use. We do not think the right of the county to the stock thus taken is of such a character as to prevent the State from providing that it shall be transferred and issued to those who paid the money with which it was bought. It is equitably theirs. Their money bought and paid for it."

Reliance is also placed upon *Mount, Trustee,* v. *The State ex rel. Richey* (1883), 90 Ind. 29. The facts in that case were as follows:

"William J. Richey, the relator, was the trustee of Finley township, and as such deposited, as his predecessors for a long time had done, funds of the township in a private bank of another State; the bank failed, the money was lost, and Richey reimbursed the township. The taxpayers petitioned the Legislature to refund the money to him, and, in accordance with the prayer of the petition, an act was adopted directing that the township trustee should refund it; the trustee refused, and Richey applied for and received a writ of mandate."

This court said that "reimbursing a public officer for the loss of public funds, occurring while he is engaged in discharging public official duties, cannot be deemed an appropriation to private purposes" and restricted the force of the decision as follows:

". . . we do no more than decide that the Legislature has power to direct the application of township funds to the payment of claims growing out of the discharge of official duties by the trustee, where the claims are of a public nature."

In the Mount case there was no question of impairment of contract and this court treated the appropriation as one for a public purpose. In the instant case there is nothing remotely resembling a "claim of a public nature" arising out of the discharge of official duties.

In the case of *McClelland, Trustee* v. *The State ex rel. Speer* (1894), 138 Ind. 321, 331, 37 N. E. 1089, funds in the hands of the relator as trustee of a township were

lost. Speer replaced a portion of the lost funds and the General Assembly passed an act directing the then trustee to reimburse Speer and in the same act released Speer and his sureties from liability on a judgment which had been recovered for the balance. In respect to the return of the money which Speer had paid into the township fund the court spoke as follows:

> "He had no right in law or in equity to a return of the money, and a return of it to him would amount to nothing short of a gift. Raising the funds for that purpose from the various taxpayers of Wayne township, by tax, would be, in effect, taking the property of one man to bestow it upon another. It would be a taxing of the property of the citizens of that township for a private, and not a public use."

That is, the court considered that repaying Speer out of money raised by taxation would be using public funds for a private purpose.

In respect to that part of the act which released Speer and his sureties from liability upon the judgment the court simply stated that, p. 338: "So far as the act in question attempts to release the trustee and his bondsmen from liabiliy on account of judgment rendered against them in the Marion Superior Court, we think the act is in conflict with §24 of the Bill of Rights which provides that 'No . . . law impairing the obligation of contracts shall be passed, . . .' " A judgment is regarded as a "contract on record" and an impairment of the judgment obligation is properly treated as an impairment of a contract obligation. It is true, as pointed out in the brief in the Monroe township appeal, the statement respecting the validity of that part of the act pertaining to the release from the judgment was dictum; but it was the statement of an able judge concurred in by all members of this court.

Following the McClelland case this court, in *Johnson* v. *The Board of Commissioners* (1895), 140 Ind. 152,

39 N. E. 311, held an act of the General Assembly invalid which attempted to release a county treasurer and his surety from liability for repayment of county funds which had been lost in a bank failure.

The last two cases are criticised in briefs for failure to cite authorities and to give reasons for holding that the acts in question violated the constitutional prohibition against impairment of contractual obligations. But the decisions on that point are undoubtedly sound unless as argued in this appeal local municipal corporations under the law of Indiana have no legal interest in the contracts made in their names with private individuals for the protection of the property and funds of the corporation, which property and funds represent money raised by local taxation for needs of local government.

In my opinion the Sureties Relief Act of 1933 violates Art. I, §§23 and 24 of the Indiana Constitution by granting a special immunity to a relatively small class of contract obligors which does not "equally belong to all citizens upon the same terms" and by impairing the obligation of the contract between Bolivar township, through its board of finance and the defendants. Nor can the act be upheld as an exercise of the state police power. A statute which grants immunity from contract obligations to a relatively small group of sureties upon depository bonds, with the result that the taxpayers of the corporations whose funds are involved must bear the loss occasioned by the grant of immunity, "cannot be upheld as basing its classification on reasons of public safety, public health, public morals or public welfare, so as to justify a classification not otherwise permissible." (*Davis Construction Co.* v. *Board, supra*).