TINDER, AS PROSECUTING ATTORNEY ET AL. *v.* CLARKE
AUTO CO., INC., ETC.

[No. 29,611. Filed April 30, 1958. Rehearing denied
June 3, 1958.]

304

*Asa J. Smith,* of Indianapolis, for appellant John Tinder, Prosecuting Attorney, of Marion County.

*Andrew Jacobs,* of Indianapolis, for appellant Robert O'Neal, Marion County Sheriff.

*Michael B. Reddington,* of Indianapolis, for appellant Frank Mueller, Indianapolis Chief of Police.

*Alan W. Boyd* and *Barnes, Hickam, Pantzer & Boyd,* of counsel, all of Indianapolis, for appellant Automobile Dealers Association of Indiana, Inc.

*John A. Carson,* of Indianapolis, for appellee.

ACHOR, J.—This action was brought by appellee on behalf of himself and all other motor vehicle dealers similarly situated to enjoin the appellants from enforcing the provisions of Chapter 222, §2, p. 490, Acts 1957 (being §10-4305, Burns' 1957 Supp.). The law subjects motor vehicle dealers who engage in the business of buying, selling and/or exchanging motor vehicles at retail on Sunday to fines and/or imprisonment[1] greater than that imposed upon this and other busi-

---

1. Section 10-4305, Burns' 1957 Supp. provides in part: ". . . Any (such) person . . . shall be guilty of a misdemeanor and, upon a first conviction, shall be liable to a fine of not to exceed one hundred dollars [$100], to which may be added imprisonment for a determinate period of time of not to exceed ten [10] days, or to both such fine and imprisonment; for a second offense, upon

nesses which are made unlawful by the general Sunday closing law.[2]

The injunction was asked for on the ground that the classification of the act which imposed a greater penalty on the class was "wholly arbitrary and unreasonable," and therefore unconstitutional, in violation of Article 1, §23, and Article 4, §§22 and 23 of the Indiana Constitution.[3] The injunction was granted, as prayed. The error assigned is that the court erred in granting the temporary injunction and the only issue presented thereunder is whether the act violates the above referred to provisions of the Indiana Constitution.[4] We will therefore consider only these issues as presented by the litigants in the record before us.

conviction, he shall be liable to a fine of not to exceed five hundred dollars [$500], to which may be added imprisonment for a determinate period of time not to exceed thirty [30] days, or to both such fine and imprisonment; and for a third and each subsequent offense, upon conviction, he shall be liable to a fine of seven hundred and fifty dollars [$750], to which may be added imprisonment for a determinate period of time of not to exceed six [6] months, or to both such fine and imprisonment."

2. The general Sunday closing law provides in part: "Whoever being over fourteen [14] years of age, is found on the first day of the week, commonly called Sunday, rioting, hunting, quarreling, at common labor, or engaged in his usual vocation, works or charity and necessity only excepted, shall be fined not less than one dollar [$1.00] nor more than ten dollars [$10.00] (with stipulated exceptions); . . ." §10-4301, Burns' 1956 Repl.

3. Article 4, §22 prohibits the passing of a local or special law in any of certain enumerated cases, including those, "[2] For the punishment of crimes and misdemeanors;"

Article 4, §23 provides that, "In all the cases enumerated in the preceding Section, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State."

4. Appellant has not questioned the jurisdiction of the court to entertain these proceedings even though the business, to the extent for which appellee seeks injunctive relief, is unlawful under §10-4301, Burns' 1956 Repl. See, *Tinder* v. *Music Operating* (1957), 237 Ind. 33, 142 N. E. 2d 610, 617, 618.

". . . it is proper that the court on appeal should consider such questions only as were presented to and decided by the trial court. . . ." *Simmons* v. *Simmons* (1917), 186 Ind. 575, 577, 116 N. E. 49; *Public Serv. Comm.* v. *Indianapolis Rys.* (1947), 225 Ind. 656, 76 N. E. 2d 841.

It is not disputed that each of the foregoing provisions permit reasonable classification. The legal principles which govern the validity of classifications within the limitation of the above constitutional provisions have long been settled. In the case of *State* v. *Griffin* (1948), 226 Ind. 279, at pages 285, 287, 288, 289, 290-291, 79 N. E. 2d 537, this court considered and upheld the validity of a statute making it a crime for males, but not females, to visit gambling houses. In that case, as in this, it was contended that the statute violated each of the three constitutional provisions referred to above. In sustaining the statute this court considered said three constitutional provisions as related to the particular classification.

This court first considered Article 1, §23, *supra:*

"'The General Assembly shall not grant to any citizen, or class of citizens, privileges, or immunities which, upon the same terms, shall not equally belong to all citizens.'" (P. 285.)

With respect to this provision the court reasoned as follows:

"In the matter of the classification of objects for the purpose of legislation, the rules have been well stated thus:

'. . . It is, of course, competent for the legislature to classify objects of legislation. It has a large discretion in this regard, and if the classification is reasonable, not artificial or arbitrary, and rests upon some substantial difference of situation or circumstances indicating the necessity or propriety of legislation restricted to the class created, it will be upheld. It must have regard to the character of the legislation and the distinctions must bear a proper relation to the classification. . . . However, if these fundamental requirements are present, it has been said that classification need not be scientific, consistent, logical or exact. It is not necessary that the reason for the classification

should appear on the face of the legislation. In determining the propriety of the classification the court may resort to facts that are within its judicial knowledge, contemporaneous conditions and situations of peoples, existing state policies, and matters of common knowledge.' 59 C. J., Statutes, §319, pp. 732, 733.

"See also *Fountain Park Co.* v. *Hensler* (1927), 199 Ind. 95, 101, 155 N. E. 465; *Sarlls, City Clerk* v. *State ex rel.* (1929), 201 Ind. 88, 104, 166 N. E. 270; *Long* v. *State* (1910), 175 Ind. 17, 92 N. E. 653. (P. 287.)

. . .

"*Any classification that may be made, necessarily is arbitrary. The most that can be said is that some may be more arbitrary than others.* Horack's Sutherland Statutory Construction (2d Ed.) §2106—quoted in *Perry Twp.* v. *Indianapolis Power & Light Co., supra,* at page 68 (224 Ind. 59, 64 N. E. 2d 296). (Our italics.)

"The desirability, or need for legislation is entirely for the legislature to determine. *The question of its wisdom in adopting a classification is a matter of no concern to the courts. The courts may determine only whether the classification is founded on substantial distinctions in the subject matter, or is so manifestly unjust and unreasonable as to destroy the lawful use of property. Koplovitz* v. *Jensen* (1926), 197 Ind. 475, 487, 151 N. E. 390; *Bedford Quarries Co.* v. *Bough* (1907), 168 Ind. 671, 80 N. E. 529, 14 L. R. A. (N. S.) 418. (Our italics.) (P. 288.)

. . .

". . . The section complained of is but an implementation of the police power of the state, to guard the morals of the citizens, and to forbid any one from visiting such places of iniquity. In such matters the legislature has a large discretion. It may determine when such legislation is needed and the means necessary to accomplish the intended purpose. . . . The exercise of a purely police power, when applied alike to all who may be affected in its exercise cannot violate §23, Art. 1 of the Indiana Constitution. . . ." (P. 289.)

This court next considered Article 4, §22, *supra:*

" '. . . The General Assembly shall not pass local or special laws, in any of the following enumerated cases, that is to say: . . . (2) for the punishment of crimes or misdemeanors. . . .' " (P. 290.)

With regard to that provision this court stated:

"This section of the Constitution is not violated by the involved act, because it applies to all who come within its provisions, generally and without exceptions, and *it rests upon an inherent and substantial basis of classification.* 'A law which applies generally to a particular class of cases is not local or special. The Constitution does not require that the operation of a law shall be uniform, other than that its operation shall be the same in all parts of the state under the same circumstances.' *Sarlls, City Clerk* v. *State ex rel., supra,* page 104; *Saraceno* v. *State* (1931), 202 Ind. 663, 666, 177 N. E. 436." (Our italics.) (PP. 290-291.)

Finally the court considered Article 4, §23, *supra:*

" 'In all the cases enumerated in the preceding Section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the State. . . .' "

With regard to this provision the court merely stated:

"What we have said above applies to the contention that the statute involved violates §23, of Art. 4 of the Constitution of Indiana, . . ." (P. 291.)

Furthermore, it is a matter of common knowledge that, with regard to other offenses, the legislature has enacted many "special laws" which have imposed greatly varied penalties "for the punishment of crimes and misdemeanors" (Art. 4, §22, *supra*) within certain other general classifications of crime, depending upon the type of each particular offense.

For example, there are no less than 16 distinct penalties provided for the general crime of embezzlement,

with penalties which vary from a $1.00 fine to imprisonment for a period of 21 years. §§10-1701—1717, Burns' 1956 Repl. There are no less than nine distinct penalties for the general crime of burglary, with penalties which vary from 10 days imprisonment to imprisonment for 10 to 21 years. §§10-701—706. There are no less than eight distinct penalties provided, for the general crime of arson, with penalties which vary from a $5.00 fine to imprisonment for two to twenty-one years. §§10-301—308.

From the foregoing discussion, it appears that the issue of whether a particular classification rests upon an inherent and substantial basis is basically the same under each of the three constitutional provisions herein claimed to be violated.

Furthermore, in determining whether such classification rests upon a substantial basis inherent to the subject-matter, or is purely arbitrary, this court is committed to the following well established rules: (1) The making of classifications in the exercise of the police power is a matter of public policy, and therefore in the first instance it is the province of the legislature to determine what classifications are reasonable in view of the purpose to be accomplished. This court may not substitute its judgment on such question for that of the legislature, unless the classification is so manifestly arbitrary as to leave no room for reasonable minds to differ on the subject. *State* v. *Griffin, supra* (226 Ind. 279) ; *Sperry & Hutchinson Co.* v. *State* (1919), 188 Ind. 173, 181, 122 N. E. 584; *Bolivar Twp. Bd. of Finance* v. *Hawkins* (1934), 207 Ind. 171, 181, 191 N. E. 158; *Baldwin* v. *State* (1924), 194 Ind. 303, 141 N. E. 343; *Bally et al.* v. *Guilford Twp. School Corp., etc.* (1954), 234 Ind. 273, 126 N. E. 2d 13. (2) The classification may be distinguished

(a) by the extent of the injurious effect considered to exist within the general class. Therefore, where the class affects an unusually large number of people adversely to the purpose of the law, or (b) where the nature of the particular business is such as to induce greater violation of the law than is true of other businesses, and where the penalty provided under a general law is considered inadequate as a deterrent, there is reason to provide a greater penalty upon the class which experiences and/or induces the greater violation.[5] (3) The burden of demonstrating the unconstitutional character of the law is upon the person challenging its validity.[6]

In determining whether or not the business here in question possesses distinctive characteristics with respect to the general Sunday closing law, it is necessary that our consideration extend into four distinct, but interrelated, areas. They are:

First: The purpose of the Sunday closing laws generally.

---

5. ". . . It is but reasonable that in every case of the violation of law the penalty should be graduated by the character and circumstances of the offense, *and in proportion to its injurious consequences to the public.* (Our italics.)

". . . The graduation of penalties for offenses differing in their circumstances and surroundings is a matter wholly within the competence and discretion of the legislature, . . ." *State* v. *Hogriever* (1899), 152 Ind. 652, 661, 53 N. E. 921, 45 L. R. A. 504.

6. "When the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, *and one who assails the classification must carry the burden of showing* by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, *that the action is arbitrary. Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61 (31 S. Ct. 338, 55 L. Ed. 369, Ann. Cas. 1912C, 160); *Lawrence* v. *State Tax Commission of Mississippi,* 286 U. S. 276, 283 (52 S. Ct. 556, 76 L. Ed. 1102, 87 A. L. R. 374)." *Borden's Farm Products Company, Inc.* v. *Baldwin* (1934), 293 U. S. 194, 209 (55 S. Ct. 187, 79 L. Ed. 281); *Hanley* v. *State* (1954), 234 Ind. 326, 123 N. E. 2d 452, 126 N E. 2d 879.

Second: The characteristics of the particular business, as related to the purpose of the law.

Third: The distinctive adverse effect of the business upon persons engaged therein and upon society in general, as related to the purpose of the law.[7]

Fourth: The analysis of the particular business, as compared with other specific businesses claimed to be without distinction, as related to the purpose of the law but not subjected to the more severe penalties of the special law.

Obviously and foremost to a decision in this case, an understanding regarding the purpose of Sunday closing laws generally is necessary.

First: The purpose of such laws is grounded upon the concept that man needs one day each week free from labor. This concept has been recognized by our Judean-Anglican society since the early promulgation of the Ten Commandments, in which it was stated: "Six days shalt thou labour, and do all thy work. . . ."[8] This was both the religious and civil law of the Hebrew nation. The concept has been adopted by the governments of most civilized societies. This court has recognized the broad and deep-seated purposes of Sunday closing laws by stating:

"These decisions, . . . indicate the general sentiment and the fixed public policy in the states of the Union on the subject of Sunday legislation. *That sentiment is too widely spread and profound, and that policy too firmly embedded in the laws, and in the decisions of the courts to be changed or*

7. "It will appear by examination of the exceptions in Sunday Laws that they are sometimes made for the benefit of the business or vocation exempted, sometimes for the benefit of those patronizing the business or vocation exempted, sometimes for the benefit of both, and again for the benefit of society generally." *Carr* v. *State* (1911), 175 Ind. 241, 262, 93 N. E. 1071, 32 L. R. A. (N. S.) 1190.

8. Exo. 20;9, 10.

*overthrown."* (Our italics.) *State* v. *Hogreiver* (1899), 152 Ind. 652, 661, 53 N. E. 921.

The enactment of the concept into civil law is grounded upon man's need, and not upon mere religious compunction. This fact was emphasized some 2,000 years ago by One who said: "The sabbath was made for man, and not man for the sabbath."[9]

A legitimate question then is, apart from any concept of religious compulsion, what constitutionally recognized public purposes related to man's welfare justify this exercise of the police power of the state? Sunday closing laws have uniformly been justified solely upon the need of man's body for *a day of rest.* This need was well stated in *People* v. *Havnor* (1896), 149 N. Y. 195, 203, 204, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707, cited by this court in *Carr* v. *State* (1911), 175 Ind. 241, 255, 93 N. E. 1071, 32 L. R. A. (N. S.) 1190, where it is said:

"... According to the common judgment of civilized men, public economy requires, *for sanitary reasons, a day of general rest from labor,* and the day naturally selected is that regarded as sacred by the greatest number of citizens, as this causes the least inconvenience through interference with business. (*Lindenmuller* v. *People, supra* (33 Barb. 548).)

. . .

"... This affords an opportunity, recurring at regular intervals, for *rest,* needed both by the employer and the employed, and the latter, at least, may not have the power to observe a day of *rest* without the aid of legislation. As Mr. Tiedman says in his work on Police Powers: 'If the law did not interfere, the feverish, intense desire to acquire wealth, ... inciting a relentless rivalry and competition, would ultimately prevent not only the wage earners, but likewise the ... employers themselves, from yielding to the warnings of nature and obeying the instinct of self-preserva-

9. St. Mark 2:27.

tion by resting periodically from labor.' (Tiedman's Lim. Police Powers, 181.) . . . " (Our italics.)

Likewise, in the case of *Armstrong* v. *State* (1908), 170 Ind. 188, 192, 84 N. E. 3, this court considered the law as related to the need of man's body for a periodic day of rest, stating, " . . . its chief object was to enforce the observance of Sunday as *a day of rest.* . . . " (Our italics.)

However, a concept which considers only man's need for a recurring day of rest recognizes only one aspect of the character of man's need, which is served by securing to him a recurring day free from labor. We know that man, as contrasted with mere beasts of burden, is endowed with mind and spirit, as well as body. Because of this fact, his physical well-being alone not only requires rest for his body, but also requires that he be given an opportunity for recreation and the development of his mind and spirit. This is demonstrated by the fact that a large portion of man's physical ailments are not organic, but are psychosomatic. Recognizing this multiple character of man's being, it has been stated by an eminently great American statesman that the public morality is of the greatest concern of government, and that such morality has its foundation in religion.[10]

10. "Of all the dispositions and habits which lead to political prosperity, Religion and morality are indispensible supports. In vain would that man claim the tribute of Patriotism, who should labour to subvert these great Pillars of human happiness, these firmest props of the duties of Men and citizens. The mere politician, equally with the pious man ought to respect and to cherish them. A volume could not trace all their connections with private and public felicity. Let us simply be asked where is the security for property, for reputation, for life, if the sense of religious obligation desert the oaths, which are the instruments of investigation in Courts of Justice? And let us with caution indulge the supposition, that morality can be maintained without religion. Whatever may be conceded to the influence of refined education in minds of peculiar structure, *reason and experience both forbid us to expect that National morality can prevail in exclusion of religious principle.*" Washington's Farewell Address.

So it is that, although no law shall impose upon any man any compulsion to worship or accept any religious belief, nevertheless it is the rightful concern of government, that not only shall man have a recurring day set apart for rest for his body, but that such day shall also provide all men with a free opportunity and suitable climate for recreation,[11] moral development and worship, even for those persons who choose not to take advantage of the opportunity. Thus it is reasonable that the day set apart for man's well-being concur with the day observed by the greatest number of other persons with whom he must share these experiences and that all persons be required to respect its observance. This is true particularly as related to the family and also to society generally.

The purpose of the law as related to the family is worthy of brief consideration. We have said that the home is the cornerstone of society. Man's physical and mental well-being, his material prosperity, and his respect for the institutions and laws of society are largely determined by the character and stability of the home. Today, however, a large percentage of the fathers, mothers and older children are industrially employed, oft'times on different shifts and on totally different days. This disrupting influence upon the family is reflected in the lamentable experience regarding divorce, juvenile delinquency and crime. These conditions demonstrate man's need for a single recurring day free from toil, when family ties can be strengthened through recreation and worship shared by the family as a unit. These considerations currently prompt civic leaders and the clergy alike to stress the idea that "The sabbath belongs to the family."

11. See, *Carr* v. *State* (1911), 175 Ind. 241, 93 N. E. 1071.

Furthermore, because of man's vicarious nature, and because of the further fact that worship is essentially a corporate activity or experience, it is necessary that men be given opportunity to participate in their recreation and worship simultaneously with other members of society. This fact is so well recognized that it need not be supported by discussion.

In summary, the purpose of the general Sunday closing law then is to provide a day for man's recurring need for rest, relaxation, recreation and worship, which can best be accomplished by the general cessation of labor on that day.

Second: We next consider the characteristics of the business of selling automobiles at retail as related to the purpose of the Sunday closing law. We know that in size and scope the automobile industry and the retail sale of automobiles constitutes a major segment of our economy. And as to the manner in which the business is conducted, we know that each manufacturer makes the maximum number of cars which he believes the market can consume and ordinarily changes the models each year, thus making it necessary for franchised dealers to sell such cars within the year of the model or suffer serious loss.

We know that many dealers operate their retail automobile business on open lots exclusively and that those with permanent buildings also usually conduct such lots in connection with the retail sales of used cars. On these lots large numbers of automobiles are on continuous display. Many retail automobile dealers, especially with respect to operations on open lots, make use of loud speakers, amplified music and other noise-producing devices and, on occasion, offer gifts and refreshments to attract customers on Sundays as well as

on other days. Many retail dealers advertise extensively on radio, television and other advertising media that they are open on Sunday, and seek to attract to their places of business customers residing outside the particular locality where the dealers are engaged in business, and, as a result, many persons do travel on Sunday to distant cities and towns to the car lots of such dealers. The lots are located upon the most heavily traveled highways possible. Because of this emphasis on Sunday selling, large numbers of people frequently collect at such places on Sunday, thus increasing the traffic congestion and hazards at such locations.

Because of this highly competitive situation and because of the fact that the automobile is a high-priced article, with limited numbers of buyers, the operation of such retail business on Sunday by any substantial number of dealers forces other dealers to operate on Sunday regardless of their personal desires in order to maintain their competitive positions. During recent years it is common for many of such businesses to operate not less than 12 hours per day during the week and not less than eight to ten hours on Sunday. Salesmen for such establishments are customarily employed upon a commission basis only, which arrangement almost compels them to work whenever the establishment is open and especially on Sunday when special appeal is made for customer traffic. As stated by Chief Justice Vanderbilt of the Supreme Court of New Jersey, a jurist of wide reputation:

"In the present state of Sunday activity in this automotive age, there are sections of our highways . . . almost exclusively devoted to the sale of new and used cars, where the owners and employees, *forced by the unreasonable and competitive lust of some of their neighbors in the trade,* are compelled to maintain their business vigil every day of the

week and for long hours; who can say that this is not inimical to the public good? . . ." *Gundaker Central Motors* v. *Gassert* (N. J. 1956), 127 A. 2d 566 (Appeal dism'd 354 U. S. 933, 1957).

The severity of this type of competition is evidenced by the fact that although a record number of automobiles have been sold during the last few years, a large percentage of the established automobile dealers have been forced out of business at a loss of multiple millions of dollars.

Three: What are the distinctively adverse effects of the Sunday operation of such businesses upon the persons who engage in the business, and upon society generally, as related to the purpose of the law? We have already discussed the position in which the *proprietors* of establishments which sell automobiles at retail and their *salesmen* find themselves with respect to Sunday closing. Because of the character of the business and the manner in which it is conducted, those who would prefer not to operate on Sunday find themselves almost compelled to do so in order to maintain their competitive position and all who operate on Sunday do so under mental and nervous pressure. Both situations are inimical to the concept which is the purpose of the law, as heretofore discussed.

Furthermore, the transaction involved is unique as related to the *customer* and the proprietor. The transaction often involves the equivalent of a full year's income for the customer. It usually involves the trade-in of the customer's automobile which necessarily involves some, and often, intensive bartering before an exchange agreement is reached. Furthermore, the transaction necessarily involves the transfer of title and usually negotiations regarding insurance in which the state

has a real interest,[12] and the execution of a conditional sales contract which, under the general statute, cannot lawfully be executed on Sunday.[13] As a consequence there is an exchange of a great amount of mobile property evidenced only by installment contracts,[14] which are not valid as between the parties. The effect of such transactions upon both the customer and the proprietor is unique and grossly incompatible with the concept of rest, relaxation or worship, when conducted on Sunday.

Finally we consider the distinctive characteristics of the Sunday sale of automobiles in its effect upon the *general public,* as related to the purpose of the act. As stated heretofore, in our present economy such sales are significant because of their extent and nature. In its extent the retail sale of automobiles is one of the largest, if not the largest, businesses of the general character which operates on Sunday in violation of the

---

12. Motor Vehicles: Certificate of Title, §§47-2501, Burns' 1957 Supp., 47-2502 and 47-2518, Burns' 1952 Repl. Proof of financial responsibility, §47-1048, Burns' 1952 Repl.

13. §10-4301, Burns' 1956 Repl.

In *City of Evansville* v. *Morris, et al.* (1882), 87 Ind. 269, 272-273, 44 Am. Rep. 763, this court stated: ". . . The ground upon which courts have refused to maintain actions on contracts made on the Sabbath day is the elementary principle that one who has participated in a violation of the law can not assert any right growing out of such illegal transaction. *Cranson* v. *Goss,* 107 Mass. 439 (9 Am. R. 45). It is said in this case that: 'It is upon this principle, that a bond, promissory note or other executory contract, made and delivered upon the Lord's day, is incapable of being enforced, or, as is sometimes said, absolutely void, as between the parties. . . .'

"The rule is thus stated in *Johns* v. *Bailey,* 45 Iowa, 241: 'The ground of the principle upon which such a contract is pronounced invalid is the violation of the day by the parties thereto. It is *causa turpis*. The parties to the contract are *participes criminis*, and are in *pari delicto;* neither can enforce the contract, for both are violators of the law.'" *Krauss* v. *Weaver* (1921), 191 Ind. 133, 130 N. E. 800; *Pate* v. *Wright* (1869), 30 Ind. 476; *Perkins* v. *Jones* (1866), 26 Ind. 499. See also: 3 Williston on Sales, §665, pp. 570, 571; 6 Williston on Contracts, §1700, pp. 4813, 4814, and §1702, p. 4818.

14. Automobile installment contracts totalled $15,122,000,000 on Feb. 28, 1958. The Federal Reserve Board. See: The Wall Street Journal, April 4, 1958.

general Sunday closing law. As to the nature of the business as it affects the general public, we have heretofore cited the fact of its Sunday operation is extensively advertised by newspaper, radio and television. The Sunday operation often includes the use of loud speakers, gaudy decorations and refreshments as a means of exploitation. As a necessary incident to the operation of such business on Sunday the activity of these locations, which generally are conspicuously located on popular highways, often present a traffic hazard not justified as related to rest, recreation or worship. In any event the activity creates a climate and an influence upon the general public which is uniquely adverse to the concept that the public health, morals and welfare requires a concurrent day set apart for rest, recreation and worship.

Fourth: We consider characteristics of the retail sale of automobiles as compared with other specific businesses which appellee has asserted are without distinction. What about the *auction sales of automobiles?* Such sales are to dealers only, and not to the general public. This means that (a) there are comparatively few persons involved; (b) that such persons are experienced in business, (c) and are present without influence from their employers. Furthermore, (d) there are no trade-ins; (e) the terms are cash, with no installment insurance contracts to be negotiated and executed. Likewise, the businesses of selling *real estate* and *farm machinery* possess many of the same distinguishing characteristics. Said businesses involve a comparatively few people. Neither of these businesses are characterized by the planned maximum production as is true of cars, the periodic sale of which is made necessary to a comparatively limited number of buyers through the medium of annual model change. They do

not possess the competitive characteristics which create the same pressure on the proprietor and salesmen for long hours during the week in addition to regular Sunday selling, as in the automobile business. And because of the small number of establishments selling farm machinery on Sunday, and because most houses sold are not located on heavily traveled highways, such activities do not create the same traffic problem.

Other retail businesses, such as grocery and drug stores and filling stations, are distinctive from the automobile business in that they do not operate under the same competitive pressure and their Sunday operations have not been so highly propagandized. Unlike the automobile they handle commodities which the public buys and consumes from day to day, in which, with respect to their needs, emergencies may well arise. Furthermore, with regard to filling stations, travel has been described as America's greatest pastime. Therefore, for recreational reasons, it might be considered that filling stations should remain open on Sunday. Likewise, the operation of *barber shops* is distinguishable. As stated in the case of *Armstrong* v. *State* (1908), 170 Ind. 188, 193, 84 N. E. 3: " . . . The business of barbering is cleanly in itself, and ordinarily conducted in a quiet and orderly way, . . ." That business is related to a very minor service and affects only a small segment of the populace. In fact, it possesses none of the highly competitive, legal or traffic implications which are characteristic of the Sunday sale of automobiles.

We conclude therefore that there are characteristics in the several businesses cited by appellee which, as related to the purpose of the general Sunday closing law, distinguishes them from the retail sales of automobiles. The law creates a pre-

sumption in favor of the constitutionality of the statute involved. The burden was upon the appellee as the attacker to overcome this presumption. *Hanley* v. *State, Dept. of Conservation et al.* (1954), 234 Ind. 326, 123 N. E. 2d 452, 126 N. E. 2d 879. Appellee has not discharged this burden of proof.

Appellee also asserts that the act contains no prohibition against the retail sale of automobiles by *itinerant dealers*, but applies only to "mercantile place(s) of business," of a "permanent nature," and therefore that the act is in conflict with Art. 1, §23, *supra.* In this regard appellee has misconstrued the act. True, the act defines the term "motor vehicle establishment" as "any mercantile place of business of a permanent nature, . . ." §10-4304. However, in addition to "establishment" the act expressly is made to apply to "any individual motor vehicle retail dealer" who does not operate such an establishment.[15] The act provides:

> "*Any individual motor vehicle retail dealer,* any member of a partnership or a firm which operates a motor vehicle establishment, or any officer or director of a corporation which operates a motor vehicle establishment, or any agent or employee of such individual, partnership, firm or corporation, *who shall carry on or engage in the business of buying, selling, exchanging, dealing or trading in new or used motor vehicles,* or who shall open any motor vehicle retail establishment wherein he attempts to or does engage in the business of buying, selling, exchanging or trading in new or used motor vehicles, *or who does buy, sell, exchange or trade in new or used motor vehicles on the first day of the week, commonly called Sunday,* is hereby declared to be a disorderly person. . . ." §10-4305, *supra.* (Our italics.)

---

15. §47-2402 (s) (ff), Burns' 1952 Repl. (1957 Supp.); §47-2615, Burns' 1952 Repl.

Appellee has also urged us to consider certain facts with regard to the conduct of his own particular business. The legislature was not required to enact a statute which would take into account, nor are we permitted to consider, the particular method of operation by a single dealer. As the Supreme Court of the United States said in *Pierce Oil Corp.* v. *City of Hope* (1919), 248 U. S. 498, 500: ". . . If it were true that the necessarily general form of the law embraced some innocent objects, that of itself would not be enough to invalidate it, or to remove such an object from its grasp. . . ."

Finally appellee asserts that the purpose of the act, as evidenced by the record, is not primarily for the general health and welfare, but to serve the selfish interests of a group of automobile dealers who would, by the aid of the legislature, force acceptance of a business practice favorable to them upon all persons engaged in the business. However, there is nothing expressed in the act by which such motives can be attributed to the legislature. The same contention was made in the case of *Gundaker Central Motors* v. *Gassert, supra,* (127 A. 2d 566, 573). In that case Chief Justice Vanderbilt expressed the law on the subject as follows:

". . . But the motives of the sponsors cannot be imputed to the Legislature unless there is basis for it in its statutory expression, Keyport & M. P. Steamboat Co. v. Farmers' Transportation Co., 18 N. J. Eq. 13 (Ch. 1886), affirmed 18 N. J. Eq. 511 (E. & A. 1866) ; Soon Hing v. Crowley, 113 U. S. 703, 710, 5 S. Ct. 730, 28 L. Ed. 1145 (1885) ; 2 Sutherland, Statutory Construction (3rd ed.) §5014. We find no legal basis for attributing any desire on the part of the Legislature to act other than in the general public interest."

At this point we are impelled to comment that we are not unaware of the legislative processes by which laws are enacted. However, under our constitutional form of government, which provides for the separation of powers between the executive, legislative and judicial departments, the legislature (within constitutional limitations) is vested with power and responsibility of declaring the public policy with regard to the exercise of the police power of the state.

As stated in the *Gundaker* case, *supra,* at p. 570 :

"The State (through the legislature) has the power, in the interests of the common good, to enact all manner of laws reasonably designed for the protection of the public health, welfare, safety and morals. The exercise of the power may cause individual hardship or even limit the freedom of individual action; but so long as there is some degree of reasonable necessity to protect the legitimate interests of the public, and the regulation resulting from the use of the power is not arbitrary or oppressive, the greater good for the greater number must prevail and individual inconveniences must be suffered as the price to be paid for living in a well-ordered society. Kovacs v. Cooper, 336 U. S. 77, 69 S. Ct. 448, 93 L. Ed. 513, 10 A. L. R. 2d 608 (1949), rehearing denied 336 U. S. 921, 69 S. Ct. 638, 93 L. Ed. 1083 (1949) ; . . ."

If persons adversely affected by the acts of the legislature consider the laws enacted to be ill-conceived, unreasonable or oppressive by requiring too great a "price to be paid for living in a well-ordered society," they should seek relief from the legislature which enacted the law. They should not call upon the courts to invalidate laws merely because they consider such laws to be oppressive, if rightfully enacted within the scope of legislative authority. For us to yield to this demand would be to destroy the very framework of our government.

Although the issue presented by this appeal is one of the first impression in the state, the question has been considered by the courts of several other states. Similar statutes and ordinances have been held constitutional, within the prohibition against special or class legislation, by courts of the following states:

*Colorado*

*Rosenbaum* v. *Denver* (1938), 102 Colo. 530, 81 P. 2d 760;

*Mosko* v. *Dunbar* (1957), 135 Colo. 172, 309 P. 2d 581.

*Illinois*

*City of Chicago* v. *Willett* (1953), 1 Ill. 2d 311, 115 N. E. 2d 785;

*Humphrey Chevrolet, Inc.* v. *Evanston* (1955), 7 Ill. 2d 402, 131 N. E. 2d 70.

*Michigan*

*Irishman's Lot, Inc.* v. *Cleary* (1954), 338 Mich. 662, 62 N. W. 2d 668.

*Nebraska*

*Stewart Motor Co.* v. *City of Omaha* (1931), 120 Neb. 776, 235 N. W. 332.

*New Jersey*

*Gundaker Central Motors* v. *Gassert* (1956), 23 N. J. 71, 127 A. 2d 566, appeal dism'd for want of substantial federal question, 354 U. S. 933, 1 L. Ed. 2d 1533, 77 S. Ct. 1937.

Only in Missouri has such an ordinance been held unconstitutional. *McKaig* v. *Kansas City* (1953), 363 Mo. 1033, 256 S. W. 2d 815, 816. Also, in Florida in cases involving a general Sunday closing law not limited to the sale of motor vehicles but in which cases motor

vehicle dealers were involved, the law has been held invalid. *Henderson* v. *Antonacci* (1952) (Fla.), 62 So. 2d 5; *Kelly* v. *Blackburn* (1957) (Fla.), 95 So. 2d 260.

For an extensive discussion regarding the decisions of the various states on the subject of this action, see 57 A. L. R. 2d 969.

Under the principles heretofore discussed and recognized in the majority of the other courts which have considered the question, we conclude that §10-4305, *supra*, which imposes an additional penalty upon the already generally unlawful business of selling automobiles at retail on Sunday, does not violate Art. 1, §23, or Art. 4, §§22 and 23, *supra*, of the Constitution of Indiana.

The temporary injunction is therefore ordered vacated and the court is ordered to proceed in a manner consistent with this opinion.

Emmert, C. J., concurs.

Arterburn, J., concurs with opinion.

Landis, J., concurs in the result.

Bobbitt, J., dissents with opinion.

## CONCURRING OPINION

ARTERBURN, J.—I concur in the resulting reversal and denial of injunctive relief asked by the appellee in this case. In my opinion the remedy is misconceived. I do not think an injunction in equity can be asked against law enforcement officials in order to determine a violation of a criminal statute. If equity has such jurisdiction, then on the same theory equity may enjoin the legislature from passing a similar bill which is threatened or proposed, on the ground that the proposed legislation would be unconstitutional.

. I have set these reasons out more particularly in a dissenting opinion in *Tinder* v. *Music Operating, Inc.* (1957), 237 Ind. 33, 142 N. E. 2d 610.

However, my contention, that equity may not interfere by injunctive relief in the enforcement of criminal proceedings, has not been accepted by the majority of this court. *Tinder* v. *Music Operating, Inc., supra.* Although questioning the soundness of their position, I must acquiesce in the decision of the majority as a controlling principle of law in this state. It serves no legitimate purpose to prolong such a contention for merely personal satisfaction once the reasoning has been fully presented.

In such a situation I concur with the majority opinion in this case. I feel that the questioned legislation is within the area of the legislature's prerogative. All too frequently, those who are dissatisfied with any particular legislation are prone to ask the courts to review the wisdom or demerits of the laws, on the theory that the judiciary should save them from the unwise or improvident acts of the legislature. The forum for such complaints is in the legislature and not the courts.

DISSENTING OPINION

BOBBITT, J.—I dissent from the majority opinion for the following reasons:

The question which is determinative in this case is whether or not the Act in question violates Article 4, §22 of the Constitution of Indiana,[1] because it imposes

---

1. The relevant part of Art. 4, §22 of the Constitution of Indiana is as follows:

"The General Assembly shall not pass local or special laws, in any of the following enumerated cases, that is to say:

. . .

For the punishment of crimes and misdemeanors; . . ."

upon motor vehicle dealers as defined in the Act[2] a greater penalty for engaging in their usual business on Sunday, than is imposed by the general Sunday closing law[3] on *all* persons over 14 years of age who engage in their usual vocation, or perform "common labor" on Sunday.

I heartily endorse the principle of the general Sunday closing law which enforces one day of rest out of seven. We have had such a law in Indiana since 1818 (Acts of 1817, ch. 57), and its constitutionality has been firmly established. *State* v. *Hogreiver* (1899), 152 Ind. 652, 659, 660, 53 N. E. 921, 45 L. R. A. 504; *Carr* v. *State* (1911), 175 Ind. 241, 249, 93 N. E. 1071, 32 L. R. A. (N. S.) 1190.

I have no quarrel with the statements of law in the majority opinion, but the questions here presented cannot be decided on the basis of the reasoning applicable to a general Sunday closing law.

The general Sunday closing law (Acts 1941, ch. 75, §1, p. 191, being §10-4301, Burns' 1956 Replacement) also applies to the sale of automobiles at retail. Hence, we are not here faced with a first enactment of a penal statute relating to Sunday closing as was true in *Gundaker Central Motors* v. *Gassert* (1956), 23 N. J. 71, 127 A. 2d 566. Here in Indiana there was already in effect a law, applying to all labor save that which falls within the two exceptions in the statute, prohibiting work on Sunday and imposing a fine of not less than $1 nor more than $10 for violation thereof. The legislature then passed a new and separate Act (the

2. Acts 1957, ch. 222, p. 490, being §§10-4304, 10-4305, Burns' 1956 Replacement (Cum. Supp.).

3. Acts 1941, ch. 75, §1, p. 191, being §10-4301, Burns' 1956 Replacement.

one here in question) applying only to automobile dealers who sell at retail and imposing upon them, for engaging in their usual occupation on Sunday, a special penalty consisting of a fine of not to exceed $100 to which may be added imprisonment not to exceed ten days, with additional fines and prison sentences for second and subsequent offenses.

It appears without successful dispute, that the purpose of both Acts (the general Sunday closing law, and the one here in question) is to compel the observance of Sunday as a day of rest. The *offense* under each Act is *working on Sunday,* and the common right involved is the same in both cases.

Is it any more of a crime for an automobile dealer to work on Sunday than it is for a real estate dealer, nurseryman, grocer, farm implement dealer, supermarket operator, automobile accessory dealer, or a person engaged in "common labor," or anyone else? The subject and purpose of both Acts is the same, and the act constituting the violation (working on Sunday) is the same. This is not true in embezzlement, burglary or arson. In these neither the purpose nor the act constituting the crime is the same.[4] Is there any fair and reasonable basis for crimes of different degrees for working on Sunday?

It is asserted that ch. 222 of the Acts of 1957, §2, p. 490, being §10-4305, Burns' 1956 Replacement (Cum. Supp.) is a general law because it operates alike upon all within a defined class. This does not necessarily make it a general law, as this Court has repeatedly held:

---

4. See: Sections 10-1701—10-1717, Burns' 1956 Replacement; Sections 10-701—10-706, Burns' 1956 Replacement; Sections 10-301—10-309, Burns' 1956 Replacement.

"It is well settled that a law is not necessarily general merely because it operates upon all within a defined class, but back of that fact must be found a substantial reason why it is made to operate only upon such class. Classifications, when allowable, can only be made upon natural, intrinsic or constitutional distinctions, and special privileges, peculiar disabilities, or burdensome conditions in the exercise of a common right, may not be conferred or imposed upon a class of persons arbitrarily selected from the general body of citizens standing in the same relation to the subject-matter of the law. *Kraus* v. *Lehman* (1908), post, 408 [170 Ind. 408, 83 N. E. 714]; *Bedford Quarries Co.* v. *Bough* (1907), 168 Ind. 671 [80 N. E. 529, 14 L. R. A. (N. S.) 418]; *Town of Longview* v. *City of Crawfordsville* (1905), 164 Ind. 117 [73 N. E. 78], 68 L. R. A. 622." *Armstrong* v. *State* (1908), 170 Ind. 188, 193, 84 N. E. 3, 4, 15 L. R. A. (N. S.) 646. See also: *Henderson* v. *Antonacci* (Fla., 1952), 62 So. 2d 5, 9.

What natural, intrinsic or constitutional distinction is there between automobile sales on Sunday and the sale of any article in the conduct of the businesses above mentioned? The question furnishes its own answer.

The Act here in question cannot be upheld upon any religious principle or belief because of our constitutional provisions requiring a complete separation of church and State.[5] This country was founded upon the principle that all men should have the right to worship God according to the dictates of their own consciences; and this includes the right of non-worship as well as the right to determine that the Sabbath shall be some day other than Sunday. Prior to the adoption of our Federal Constitution some of the colonies had laws requiring people to attend church services on the Sabbath.

---

5. Article 1, §2 of the Constitution of Indiana provides that: "All men shall be secured in their natural right to worship Almighty God according to the dictates of their own consciences." See also: First Amendment of the United States Constitution.

However, after the adoption of the First Amendment to the Constitution of the United States, such laws were invalid on the ground that the State was intermingling in the affairs of the church, and Sunday closing laws are now sustained under the police power as health and sanitary measures for the general welfare, on the ground of necessity for periodical relaxation and rest from mental and physical toil. *Carr* v. *State, supra* (1911), 175 Ind. 241, 261, 93 N. E. 1071, 32 L. R. A. (N. S.) 1190; *Henderson* v. *Antonacci, supra* (Fla., 1952), 62 So. 2d 5, 8; *McKaig* v. *Kansas City* (1953), 363 Mo. 1033, 256 S. W. 2d 815, 816, and cases there cited. See also cases cited in Judge Achor's opinion under "First."

The principle applicable here is ably stated in *The People* v. *Norvell* (1938), 368 Ill. 325, 327, 13 N. E. 2d 960, 961, as follows:

"The privilege of a citizen to use his property according to his own will is not only a liberty but a property right, subject only to such restraints as the common welfare may require, and while new burdens may be placed on the property when the public welfare demands it, this power is limited to enactments having direct reference to the public health, comfort, safety, morals and welfare." See also: *Mosco* v. *Dunbar* (1957), 135 Colo. 172, 196, 309 P. 2d 581, 593 (Dissenting Opinion).

If the statute here in question is to be upheld, it must be because it is a valid exercise of the police power for the protection of the public health, morals, safety or welfare. *Kirtley* v. *State* (1949), 227 Ind. 175, 181, 84 N. E. 2d 712.

I can think of no reason, and none has been suggested by appellant or stated in the majority opinion, why the health, morals, safety or welfare of *the public* would be protected to any greater degree than is already provided by the general Sunday closing law, by

imposing a heavier penalty upon automobile dealers, who keep their places of business open on Sunday, than is imposed upon dealers in all other commodities, except works of charity and necessity, for doing the same thing. Certainly, it is no greater crime for automobile dealers to deprive their employees of a day of rest and relaxation than it is for automobile accessory dealers, real estate dealers, supermarkets, nurserymen, filling station operators or the operators of any other legitimate business to do likewise.

Yet, automobile dealers are, under the Act here in question, subject to special and much greater penalties than are imposed upon dealers in other commodities. The imposition of greater penalties upon automobile dealers as defined in the Act, in my opinion, does not concern the public health, morals, safety or welfare.

If one purpose of the Act, as Judge Achor's opinion seems to indicate, is to abate a nuisance, the remedy is misconceived. If any dealer creates a nuisance or disturbs the peace by the use of loud speakers or public address systems, those affected thereby may abate the same by a proper action. Sunday closing laws cannot be sustained upon this ground. Neither can the reason for a Sunday closing law be extended to include the theory that it provides a day for "moral development and worship," as the majority opinion would do. If this is a ground upon which Sunday closing laws may be sustained, then it certainly is no greater crime for an automobile dealer to deprive his employees of these opportunities than it is for employers in any other business to force their employees to work on Sunday. The purpose is the same and the result identical.

Christianity cannot be legislated. It can only come from the development of man's inner spirit, and laws

when motivated by and enacted for such purpose can only serve as a weapon for intolerance.

The question of the validity of any contracts which might have been made on Sunday is not an issue in this case. Since this question was not considered by the trial court, it is improperly considered here. See cases cited in Note (4) of majority opinion.

Since the majority opinion has attempted to decide this question, I feel compelled to add that, if contracts for the sale of automobiles are executed on Sunday, such fact would not be grounds for sustaining the law here in question. The general public certainly has no interest in a contract between an automobile dealer and his customers. The only persons affected thereby are the parties to the contract.

Many other things, including amateur baseball games, midget and stock car auto races, and even churches create traffic hazards on Sunday. (The writer of this dissent was the author of a majority opinion of this Court,[6] holding that the building of a church could not be prohibited because it would allegedly *cause a traffic hazard.*) No reasonable person can say that it is a crime in any greater degree for automobile dealers to add to the traffic congestion on Sunday than it is for any other business or sport to do so. I doubt if the noise made by autmobile sales lots is any greater than that occasioned by midget and stock car races which are held on Sunday in many places in Indiana.

A careful study of the record in this case convinces me that the primary purpose of the Act in question is not to promote the general health and welfare, but to serve the selfish interests of a group of automobile

---

6. *Bd. of Zoning Ap. of Decatur* v. *Jehovah's Witnesses* (1954), 233 Ind. 83, 117 N. E. 2d 115.

dealers, who would, by the aid of an invalid Act of the legislature, force acceptance of the business practices of one group upon all persons engaged in the business of selling automobiles at retail, and thus further extend the long strangling fingers of bureaucracy to control another legitimate business. . . . . . . . . .

"If the law prohibits that which is harmless in itself, or requires that to be done which does not tend to promote the health, comfort, morality, safety or welfare of society, it will be an unauthorized exercise of power, and upon proper presentation it is the duty of the courts to declare such a law void. *The People* v. *Steele, supra* [(1907); 231 Ill. 340, 83 N. E. 236, 14 L. R. A. (N. S.) 361, p. 345. *Weisenberger* v. *State, supra* [(1921), 202 Ind. 424, 175 N. E. 238], p. 429. *People* v. *Weiner, supra* [(1915), 271 Ill. 74, 110 N. E. 870, L. R. A. 1916C 775], p. 78. *Liggett Co.* v. *Baldrige,* 278 U. S. 105, 73 L. Ed. 204." *Kirtley* v. *State, supra* (1949), 227 Ind. 175, 181, 84 N. E. 2d 712, 714.

Automobile dealers are already subject to the same penalty as are other persons engaged in their usual occupation on Sunday, and the only purpose of the Act fixing a greater and special penalty on them for so doing is to place a further and additional restraint upon their individual freedom and private initiative.

My observation has been that the competitive spirit is no greater in the automobile business than it is in the grocery, real estate, farm implement, electrical appliance, auto accessory, filling station and many other businesses, nor is there anything in the record here to justify any different conclusion. Special sections in the Sunday editions of our local newspapers advertising real estate for sale on Sunday, attest to the "severity" of competition in this business.

As a rule few cars are purchased unless the family has had an opportunity to see and examine them, and

in many instances Sunday afternoon is the only time when the family, as a unit, is free to shop for a new car. This same condition applies likewise to the purchase of a home. It is easy to understand then that on a recent rainy Sunday in Indianapolis more than 15,000 people inspected new homes.[7]

If the majority opinion is to be the law in Indiana, then there is nothing to prevent the next session of the legislature from fixing special and higher penalties on real estate dealers and thus prohibiting the sale and display of houses on Sunday, thereby depriving many families of the opportunity of inspecting their future homes together. Both an automobile and a home represent substantial investments. In most families it is probably the largest single expenditure in the lives of the people involved. This being true, it is only reasonable that the family desire to make this purchase together. By the majority opinion many are deprived of the opportunity to purchase their family automobile together. There are many more families buying automobiles than there are automobile salesmen.

As the Supreme Court of Missouri said in *McKaig* v. *Kansas City, supra* (1953), 363 Mo. 1033, 1037, 256 S. W. 2d 815, 817, as follows:

"The test of a special law is the appropriateness of its provisions to the objects that it excludes. It is not, therefore, what a law includes, that makes it special, but what it excludes."

Also, that Court, in considering the validity of an ordinance of the City of Kansas City which prohibited any dealer from keeping open his place of business for the purpose of selling and trading automobiles on Sunday and six national holidays, further said, at pages 817, 818 of 256 S. W. 2d, as follows:

---

7. The Indianapolis Star, April 28, 1958, page 15.

"The ordinance before us excludes all persons engaged in the business of selling all commodities and all merchandise except automobiles. In other words, it excludes all persons engaged in the business of selling television sets, radios, phonographs, refrigerators, washing machines, electric and gas ranges and heaters, trailers, golf equipment, furniture, hardware, clothing and many other articles.

"Do not the citizens of Kansas City who sell the above-named articles of merchandise need the same rest on Sundays as the persons engaged in the business of selling automobiles?

"Do not the customers of the people who sell the above-named articles of merchandise need the same rest on Sundays as the customers who buy from an automobile dealer?

"Is not the police surveillance the same at the place where the above-named articles of merchandise are sold as the place where automobiles are sold?

"Of course, these questions answer themselves.

"There is no reasonable basis for singling out those people who are engaged in the business of selling automobiles and excluding those people who sell the above enumerated articles of merchandise who are permitted to keep open their places of business on Sundays and the six named holidays."

This, in my opinion, seems to be sound and logical reasoning and is a complete answer to the question in the case at bar.

Moreover, this Court has also spoken regarding a law which attempted to fix a greater penalty on barbers who operated their shops on Sunday, than that provided in the general Sunday closing law for similar offenses when committed by persons who operate other businesses.

In *Armstrong* v. *State, supra* (1908), 170 Ind. 188, at page 192, 84 N. E. 3, 4, 15 L. R. A. (N. S.) 646, this Court, speaking through Judge Montgomery, said:

"But the act in question merely makes the desecration of the Sabbath by a barber a special crime, and to that affixes punishment different from that imposed upon others for like offenses, and clearly falls within the inhibition of §22, article 4, of the Constitution of this State." Citing authorities.

That is exactly what the Act here in question does to automobile retail dealers, and for the reasons above stated, it clearly violates the provisions of Art. 4, §22 of the Constitution of Indiana.

All persons have a common right to engage in lawful pursuits of their choice and, in my opinion, automobile dealers stand in no different relation to the subject-matter of the Act here in question than do persons engaged in any other lawful business.

I heartily agree that every person should have a day of rest as our general Sunday law provides, but I do not believe that the legislature can fix one penalty for one person who fails to observe Sunday as a day of rest, and a different penalty for another. We cannot, except by arbitrary and unreasonable Acts of the legislature, have different classes of crimes for failure to observe the Sabbath. In my opinion it is no greater crime for one person to desecrate the Sabbath than it is for another to do so.

It is true, as Judge Achor states in the majority opinion, that statutes and ordinances pertaining to Sunday sales of automobiles have been held constitutional in the States of Colorado, Michigan, Nebraska and New Jersey. However, it appears from an examination of the cases so holding that the question of the law or ordinance being a special one for the punishment of crimes, as prohibited by Article 4, §22 of our State Constitution, *was not an issue in any one of them.* It is my opinion that these cases do not support the

position of the majority opinion on the question raised under Article 4, §22, *supra*, in the case at bar.

I would affirm the judgment of the trial court.

NOTE.—Reported in 149 N. E. 2d 808.